# CHARLESTON.

CUNNINGHAM *v.* BARNES *et al.*

Submitted January 27, 1893—Decided March 25, 1893.

1. PARENT AND CHILD—GUARDIAN AND WARD.

While it is true that the law regards the father as the natural guardian of his child and as such ordinarily entitled to its custody yet he may under certain circumstances relinquish his right to such custody, and be precluded from reclaiming its possession.

2. PARENT AND CHILD—GUARDIAN AND WARD.

The welfare of the infant is the polar star by which the discretion of the court is to be guided; but the legal rights of the parent will be respected, being founded in nature and wisdom, unless they have been transferred or abandoned.

3. PARENT AND CHILD—GUARDIAN AND WARD.

When a parent has transferred to another the custody of his infant child by fair agreement, which has been acted on by such other person to the manifest interest and welfare of the child, the parent will not be permitted to reclaim the custody of the child, unless he can show that a change of custody will materially promote his child's welfare moral and physical.

R. F. FLEMING for plaintiff in error:

I.—*The interest of the minor child is the first or paramount consideration.*—51 N. W. Rep. 1155.

II.—*A father may abandon his right to infants custody.*—7 N. W. Rep. 389.

III.—*Where the father has parted with the custody of his minor child and seeks to regain it, he must show that the change (back to his custody) will materially promote the child's welfare, morally and physically.*—35 W. Va. 698 ; 37 Ark. 29.

R. H. FREER for defendant in error:

I.—*The action of the court below, the judge of the fourth judicial circuit, was regular and legal.*—2 Chit. Blacks. 104 ; Code, c. 3 ; 6 Eng. & Am. Ency. Law, 180 ; 57 Ia. 193 ; 15 Mich. 417.

II.—*The court below did not err upon the merits, because the father is the natural and rightful guardian and entitled to*

*the custody of his infant child, unless he is clearly shown
to be unfit for the trust; and because there was no agree-
ment by him to relinquish his right to the custody of his
child.*—9 W. Va. 600; 29 W. Va. 751; 35 W. Va. 698.

ENGLISH, PRESIDENT:

This was a writ of *habeas corpus* issued in vacation by the
judge of the fourth judicial circuit of this State, upon the
petition of A. L. Cunningham, against William Barnes
and Ruhama Barnes, for the purpose of obtaining the cus-
tody of his infant daughter, Thursby Cunningham, who, at
the time said petition was filed or presented, was seven
years of age; the defendants being the grandparents of said
infant child.

The facts alleged in said petition are that the mother of
said infant child, who was a daughter of the defendants,
died on the 24th day of April, 1884, when said child was
about fifteen months old; that a few days after the death of
its mother the child passed into the hands of her said grand-
parents, where she remained up to about the 8th or 10th
of October, 1889, when said grandparents surrendered the
custody, control and care of said child to the petitioner,
and that she remained at his home, in Ritchie county,
until the night of November 4, 1889, when about twenty
men came, about twelve o'clock at night, and took and
carried away said child, and one or more of the parties in-
formed petitioner that they were taking said child to deliv-
er into the custody of said William and Ruhama Barnes;
that petitioner was married to his second wife in the month
of October, 1886, by whom he had no children, and that
said Thursby Cunningham is the only child of petitioner,
and that said child was carried away on the night of the
4th of November, as aforesaid, against her will, and against
the will of petitioner; that he is able to maintain and edu-
cate the child, and bestow upon it such care and attention
as is due to it; that he has twelve hundred dollars in real
estate besides other property; that he resides in a good
community with a school near at hand, which said child
was attending at the time she was carried away; that he
has demanded the possession of said child, but has been

unable to obtain possession of her, and has probable cause to believe that she is detained without lawful authority.

In response to said petition, and by way of return to said writ, the said William and Ruhama Barnes, among other things, stated that their daughter, on her deathbed, when in full possession of all her mental faculties in the presence of the petitioner and with his full consent and concurrence, committted the said child to the custody, care and charge of respondents, for nurture, maintenance and education, until said infant should reach her majority ; and that immediately after her mother's death, when said child was only fifteen and one half months old, she was brought by the petitioner, in conformity with said understanding and agreement, to the house of respondents, who have since gladly kept and maintained and most fondly and tenderly cared for her ; and that, when said child was so brought to respondents, she was delivered to them by petitioner, with the agreement that she should be kept by them without the interference or control of petitioner ; that said child, from that date to the present, had been entirely maintained, clothed, and cared for by respondents—her father contributing nothing to her support, and taking no control over her, only making her a visit at long intervals ;—and that respondents nursed her for seven weeks through a severe attack of fever, and paid her doctor's bill, amounting to thirty dollars ; that they own real estate of the value of three thousand five hundred dollars, and personalty to the value of one thousand five hundred dollars, and intend that said child at their death, shall share equally with their own children (of whom they have eight, of whom none are now at home, they having married and left respondents' home to provide for themselves). And they allege that petitioner is the owner of no real estate or personal property whatever ; that he is immoral, ill tempered and incapable of bearing with the shortcomings of children, uses profane language in his family, and on account of his temperament, habits, nature and disposition, he is totally unfit to have charge of said child, for the purposes of educating, training, *etc.* They deny that about the 10th day of October, 1889, they surrendered the control and custody of the infant-

child to petitioner, or that they in any way consented to part with the possession, care and custody of said child, but say that petitioner came to their home, and requested them to allow him to take said child to his house upon a visit, expressly promising to return her to respondents within a short time, and upon these promises and agreements, and upon them alone, petitioner was allowed to take said child to his home for a short time; but that said petitioner did not return the said child, as agreed, and refused to return her when requested, and that some person unknown to respondents returned said child to them.

Respondents also filed an amended answer, alleging that, previous to the marriage of petitioner to his second wife, there was an agreemeet between them that said infant-child should not be claimed by petitioner, nor taken or received into his family, and that subsequent to said second marriage said second wife left him on account of his failure to provide for her reasonable and necessary wants, and that afterwards she returned to him; and they allege that petitioner failed to provide for his present wife sufficient food and nourishment, and that she complained to her father about it, and that the health of his present wife is very poor, and she claims to be able to do but little, if any work.

Numerous affidavits and depositions were taken in the case, and witnesses were examined; and on the 14th day of August, 1890, a vacation-order was made in said cause by the judge of the fourth judicial circuit, directing that the petitioner, Asa L. Cunningham, do have the custody, possession and control of said minor child, Thursby Cunningham, and that she be delivered by the respondents to the said petitioner, Asa L. Cunningham; and the sheriff, if necessary, was directed to execute said order. The respondents excepted to the judgment of the court, and obtained this writ of error.

Now, as to the question whether the allegations contained in the pleadings were supported by the evidence, it is thought proper to call attention to the fact that while A. L. Cunningham, the relator, in his petition, alleges that he is worth some one thousand two hundred dollars of real

estate, besides other property, and swears that the allegations contained in said petition are true, yet, when he is placed on the stand as a witness, he admitted and stated on cross-examination that he was not worth anything; that he owned no real estate, and had no personal estate; that he had heretofore sold a piece of land, and had realized about one hundred dollars. Said Cunningham also states in his testimony that said Ruhama Barnes came out to him on the porch when he was preparing to start away, after the burial of his wife, and begged him to leave the child with her for a week or so, until he could get a place to take it, and took said child from petitioner's arms, and carried it into the house.

It is, however, shown by the testimony of Barbara E. Barnes, a daughter-in-law of the respondents, that she was present, shortly after the child's mother died, and heard Ruhama Barnes (defendant) say to plaintiff, if she took the child to keep, as the child's mother had requested her to do, that she would never give it up to him again. Plaintiff said it was pretty hard, but told her to take it, and went across the room, and told his sister Julia to get the child's clothes and put them in her mother's basket, which she did. He then helped Mrs. Barnes bring the child to her home. Plaintiff said at the time, while his wife was still lying a corpse, that if Mrs. Barnes took the child and cared for her when she was little, she should always keep her.

Leanna Mitchell, who petitioner admits was present, when his wife died, says, that it was the dying request of Mrs. Cunningham, that her mother, Mrs. Barnes, should take the child, and that petitioner said that it was hard to give —— of them up, (meaning both of them.)

Emily Ferguson also states that she resided with the defendents, at the time the plaintiff came after the child, just before this suit was instituted, and was present and heard the conversation in regard to taking the child to plaintiff's home. He said, if defendants would let him take the child with him, he would bring her back in a couple of weeks, and would trouble them no more about her, if they would let her stay with him that winter, and let her go to

school. It was with this understanding and agreement that he took the child.

D. P. Ayers states that he happened to be at the house of defendants, when the plaintiff was there for the purpose of getting the child to go home with him, just before the institution of this suit. The plaintiff and his father were both there together, and the plaintiff's father said that they would bring the child back in a couple of weeks. He did not hear the conversation before that. They were just fixing to start, when he came in. The child was fretting and crying, and from her appearance was very much opposed to going with her father. He was again at the house of the defendants, before the child was returned to them, and they told him that they had been informed that plaintiff did not intend to let them have the child back.

Joseph Whipkey also says: "I was present when the plaintiff came to get the child to go home with him, and heard him say that, if defendants would let him take the child home with him, he would bring it back when school was out, in the spring."

Yet A. L. Cunningham testifies that on that occasion said Ruhama Barnes pleaded with him not to take the child, and begged him to leave it as much as two years; that defendant, William Barnes, would give him five dollars per month if he would leave said child for two years; that he rejected the proposition, and took her that day to his own home; that respondents on that occasion finally gave up to petitioner the said child.

Petitioner's father, John R. Cunningham, confirms the statement of petitioner as to Ruhama Barnes begging petitioner to allow said child to remain two years, and offering to pay him five dollars per month, and says petitioner rejected all propositions and entreaties, and said he had come for the child, and intended to take her home with him, and respondents gave up the child to him, and he took her on the horse, and took her home; and he denied that it was arranged or agreed that the child was to be taken by petitioner on a visit, or to go to school until the school at petitioner's house was out, and then to be taken back to the respondents, and left with them.

Thus these two witnesses contradict all the others, whose testimony on the point has been detailed. The petitioner, however, flatly contradicts the sworn statements made by him in his petition in regard to the value of his property; and the sheriff, Job Musgrave, also shows that he was assessed with no property, and that he failed to make an execution for eighty dollars against him, and the statement of the sheriff is confirmed by B. F. Ayers, the attorney, who had the judgment against said petitioner.

The testimony of Barbara E. Barnes, Leanna Mitchell, and Ruhama Barnes clearly shows that, at the time the mother of said child was dying, she requested her mother, Ruhama Barnes, to take the child, and raise it, and the petitioner acquiesced in the arrangement by taking the child and its clothing, and delivering them to said Ruhama Barnes, at her home; and Barbara E. Barnes swears that petitioner said at that time, while his wife was still lying a corpse, that if Mrs. Barnes took the child, and cared for it, when it was little, she should always keep it; and she also heard the defendant Ruhama Barnes tell petitioner, shortly after the child's mother died, that if she took the child to keep, as its mother had requested her to do, she would never give it up to him again, and it was with this fair understanding and agreement the petitioner took the child and its clothing, and delivered them to the defendant Ruhama Barnes.

This case is somewhat similar, in its facts, to the case of *Green* v. *Campbell*, decided in December, 1891, and reported in 35 W. Va. 699 (14 S. E. Rep. 212) in which this Court held (sixth point of syllabus): "When a parent has transferred to another the custody of his infant child, by fair agreement, which has been acted on by such other person, to the manifest interest and welfare of the child, the parent will not be permitted to reclaim the custody of the child, unless he can show that a change of custody will materially promote his child's welfare, moral or physical."

In that case, as in this, the infant's mother died when he was about sixteen months old, when he was committed by his father to the care and custody of his grandparents, who took the care and custody of the child, and kept and main-

tained him up to the time the writ issued. The grandpar-
ents were industrious, of high moral character, the owners
of a farm, and considerable other property, and were well
prepared to care for said child according to his condition
in life. They were devoted to the child, and the child as
devoted to them. They had no living children of their
own, except one son, who was over twenty one years.
The petitioner in that case had contracted a second mar-
riage, but at this point the similarity in the cases ceases;
for the petitioner in that case was industrious, of high
character, good family, and capable of providing for and
raising his child according to his station in life. He was
warmly attached to his child, and the boy to him. He owned
the farm on which he resided, about three miles from the
home of the said grandparents. In that case, however, as
in this, at the time of the death of said Green's first wife, it
appeared that said Green relinquished said child to their
care and custody, with the express understanding, and upon
the expressed condition, that it was not, after awhile, to
be taken away from them.

It is not intended to assert or hold in this case that every
man who is thriftless, or who has been unfortunate and
unsuccessful in gathering around him the good things of
this world, is to be deprived of the care, custody, and control
of his children, even though his morality is not all that it
should be, or his temper such as to make his home often-
times unhappy. Our statute has expressly provided, in
section 7 of chapter 82 of the Code of 1891, that "the
father of the minor, if living, and, in case of his death, the
mother, if fit for the trust, shall be entitled to the custody
of the person of the minor, and to the care of his educa-
tion." This right, however, is not absolute, as was held by
this Court in the case of *State* v. *Reuff*, 29 W. Va. 751 (2
S. E. Rep. 801) point 4 of syllabus, in the following words:
"The right of the father or mother to the custody of their
minor child is not an absolute right, to be accorded to them
under all circumstances, for it may be denied to either of
them if it appears to the Court that the parent otherwise
entitled to this right is unfit for the trust."

That the rule is not arbitary and inflexible that the father

or mother shall be entitled to the custody of the child under the above-mentioned statutory provision is shown by section 11 of chapter 64 of the Code, in reference to divorces, which confers upon the courts the power to use their discretion in decreeing in reference to the care, custody and control of the minor children, as the circumstances of the parents and the benefit of the children may require. In all cases of controverted right to custody, the welfare of the infant is of paramount importance.

In the case of *Armstrong* v. *Stone*, 9 Gratt. 102, the Court held (third point of syllabus): "The father being dead, the mother is entitled to the custody, as of right, and does not lose this right by a second marriage; but where she is seeking, by a writ of *habeus corpus*, to have the child placed in her custody, the Court may exercise its discretion, and determine whether, under all the circumstances, it is best for the infant that he should be assigned to the custody of the mother."

Tyler on Infancy and Coverture, at page 283, quotes from Hurd on *Habeas Corpus* as follows: "The welfare of the infant is the polar star by which the discretion of the Court is to be guided, but the legal rights of the parent or guardian are to be respected. They are founded in nature and wisdom, and are essential to the peace, order, virtue, and happiness of society; but they may have been abandoned, transferred, or abused." This author also says: "It frequently happens that the father of an infant, upon the death of its mother or other event, makes an arrangement by which he gives his child to a third person, or relinquishes his custody to it, until it is of age, upon consideration that the party agrees to adopt the child, and care for it as his own, and then, after the affections of both child and adopted parent become engaged, and a state of things has arisen which can not be altered without risking the happiness of his child, will attempt to reclaim the custody of the child. In such cases few rules are found for the government of the courts, and there are decisions, both in England and this country, to the effect that the father would not be bound by such a transaction, and could recover the custody of the child, even though the interests of the child had been pro-

moted by the original transfer. But the better opinion is that the father, in such a case, is not in a position to require the interference of the court in favor of a controlling legal right on his part against the rights, such as they are, the feelings and the interest, of the other parties;" citing numerous authorities.

The same author on (t. p.) 540, speaking of voluntary transfers of custody, says: "It has been seen that a parent may emancipate his minor child by voluntarily relinquishing his claim to the services of the child, or by permitting the child to contract marriage, or other relations inconsistent with filial subjection, and may also forfeit his right of custody by cruelty or gross neglect of duty. Why, then, may he not transfer to another this right of custody which he may thus abandon or forfeit, especially where the interests of the child are not prejudiced by the assignment? And how can the Court pronounce that custody, which is held under a fair agreement with the parent, and not injurious to the welfare of the child, to be an illegal restraint?"

In 2 Am. St. Rep., page 184, Freeman, in his notes to the case of *Brooke* v. *Logan* (Ind. Sup. 13 N. E. Rep. 669) under the heading, "Right of Father to Transfer Custody of His Child," after discussing the question at some length, and citing authorities, says: "On the other hand, the weight of authority in this country sustains the position that a father can, by agreement, surrender the custody of his infant child to another, so as to make the custody of that other legal," citing several authorities. He continues: "And, in all controversies subsequently arising respecting its custody, the court will consider the welfare of the child at the matter of primary importance."

Church, in his valuable work on *Habeas Corpus*, in section 444, under the heading, "How Far a Parent may by Agreement Surrender the Custody of His Child," after speaking of the statute-law in several states, and the common-law doctrines, says: "Yet the later decisions in this country are undoubtedly against the repudiation of an agreement by a parent to surrender to another the right to the custody of his infant children, and unless a clear breach

of the agreement, or abuse of the child is shown, the courts will not assist him to recover it on *habeas corpus.*" Upon this point, in the case of *Green* v. *Campbell, supra,* this Court having expressed so decided an opinion, it may be regard-ed as no longer an open question in this State.

In the case under consideration in direct opposition to the terms of his agreement, which had been acquiesced in for more than six years, the relator asks the Court to take this child from a home where peace, plenty and harmony prevail, where she never knew neglect save from her father —and place her in the control of a stepmother who states that she is in poor health, and who exacted a promise from the relator before her marriage with him, that he would not bring said infant child to his home to reside, and who on one occasion, at least, since her marriage, left her husband and went home to her father's house with the intention of separating from him permanently and making her future home with her father.

By this petition the relator seeks to compel said infant, against her wishes, to make her home with him, when the evidence shows that he is improvident, ill tempered and immoral, and where the future of the child would be anything but pleasant. It is clear that the attachments of this child are with its grandparents, where she has been kindly nurtured and cared for in sickness and in health, and her best interests would be promoted by allowing her to remain in their custody; and following the ruling of this Court in the case of *Green* v. *Campbell, supra,* the judgment complained of must be reversed, the writ of *habeas corpus* dismissed, and the child, Thursby Cunningham, restored to the custody of her grandparents, William Barnes and Ruhama Barnes; and the cause is remanded to the Circuit Court of Ritchie in order that the requirements of this order may be complied with, and the defendant in error must pay the costs of this writ.

REVERSED.    REMANDED.