BERTHA MARGARET BELL

*v.*

DEAN EICHOLTZ *et al.*

(No. 10108)

Submitted April 20, 1949. Decided May 24, 1949.

*R. E. Hagberg, McCamic & Clarke, Charles McCamic,* for plaintiffs in error.

*George H. Seibert, Jr., James G. McClure, Thomas P. O'Brien,* for defendant in error.

RILEY, JUDGE:

Bertha Margaret Bell instituted this proceeding in habeas corpus against respondents, Dean Eicholtz and Margaret Eicholtz, in the Circuit Court of Brooke County, to recover possession of her illegitimate child, Donna Marie Hader. The trial court, upon consideration of the pleadings and the record made, directed the entry of an order to the effect that the respondents do deliver up possession, custody and control of said infant to the petitioner, as well as pay costs of the proceeding. To the foregoing judgment the respondents prosecute the present writ of error and supersedeas.

In her petition Bertha Margaret Bell represented that on December 10, 1946, while married to Percival Charles Hader, she was delivered of a female illegitimate child at Ohio Valley Hospital, Wheeling; that following her release from the hospital she was confined for a period in the Florence Crittenton Home for convalescents; that while in said home she was approached by an agent of the department of public assistance, who inquired concerning petitioner's ability to properly care for the child, and who informed her that the department was in a position to place it temporarily in a foster home, subject to return to petitioner when she became financially able to care for it; that petitioner is a resident of Maryland; that through the efforts of the department the child was placed with the Eicholtzes; that upon completion of convalescence petitioner returned to Baltimore, Maryland, where she instituted a suit for, and on April 29, 1947, secured, a divorce; that on August 2, 1947, she was married to one Wiley Lee Bell; that by reason of said marriage she is now financially able to properly care for her child; that both she and her husband are

of good moral character, and are fit persons for the custody of the child; that in June, 1947, and prior to her marriage to Bell, the latter made a trip to Wheeling to ascertain the whereabouts, and to get custody of the child; that in February, 1948, the petitioner and Mr. Bell came to Wheeling, and through the aid of an attorney located the child; that petitioner never knowingly consented to a permanent custody of said infant in any one; that she requested release of the child through her attorneys, but that respondents refused to deliver up its custody; hence, the prayer that a writ of habeas corpus do issue.

A writ was issued on the foregoing petition as of February 13, 1948, returnable February 18, 1948. On the return date respondents appeared, with Donna Marie Hader, infant, and tendered and filed their return to the writ. This return alleges that respondents were consulted prior to December 20, 1946, by a child welfare worker and listed as a suitable foster home, and that on the date aforesaid Donna was placed with them under a boarding agreement, where she was treated as respondents' own child; that respondents after one year's care consulted Mr. Hagberg, an attorney, who, at the time of the issuance of the writ of habeas corpus, was preparing a petition for adoption; that respondents are people of good moral character; that they are 42 and 38 years of age, respectively; that they have a daughter 16 years of age living, a son having died in infancy; that Mr. Eicholtz is regularly employed and receives a salary of $3,600 per year; that the petitioner (then Hader) applied to the department of public assistance for aid about August 2, 1946; that on January 16, 1947, petitioner executed a writing, wherein it was stated that she "having the sole custody and guardianship of Donna Hader * * * hereby relinquish custody and guardianship of said child * * *;" that petitioner had subsequently abandoned her child; that no communication was received from petitioner relating to her child until the issuance of the writ in February, 1948; that respondents deny specifically petitioner's allegations regarding her Maryland citizenship, the validity of her divorce, the fact of her mar-

riage to Wiley Lee Bell, and her ability, since marriage, to financially care for her child; that the respondents deny that petitioner and Bell are of good moral character. Respondents further aver that the petitioner is a person of loose character, having traveled over the country in the years 1945 and 1946 with a man not her husband; that petitioner was committed to a Maryland state mental hospital during the period April 30 to July 2, 1947; that the child was given a psychological test by Dr. Wanner of Wheeling, who gave an opinion that the child would probably develop normally if not returned to the mother but left in a normal stable home.

The order filing the return, after stating that the parties by their respective attorneys proceeded to state their contentions to the Court, gave the petitioner until March 2 to file her replication. This order recites further that, by reason of certain allegations in the return, the petitioner had offered to submit to an examination of her mental fitness to care for the child by any psychiatrist selected by the court at the expense of respondents, and the respondents agreeing to pay therefor, and "it appearing to the Court that such examination is proper and necessary" and "that Dr. A. L. Osterman of Wheeling is available and willing to make such examination", the Court ordered that petitioner submit herself to Dr. Osterman for such examination.

A replication was filed on March 2, 1948, in accord with the court's order. In it petitioner denied that the state department of public assistance ever consented to the adoption of Donna Hader; and, further, denied ever approaching Kathleen Coleman, a public assistance worker, concerning an adoption. She says that, prior to the birth of her daughter, she did approach the department and requested its aid in her forthcoming confinement, and that she signed a certain form in writing and manner as stated in the return, but that same was done by reason of the representations of Kathleen Coleman that such was necessary to a temporary placement; that the writing was not

properly acknowledged as required by Chapter 19, Article 3, Section 1, Acts of the 1945 West Virginia Legislature, where the department takes a child to be later relinquished in adoption proceedings. Petitioner denies that she had abandoned her daughter and that she was legally domiciled in the State of West Virginia since 1944; she denies that Dr. Albert L. Wanner stated that Donna Hader would develop normally if not returned to petitioner, and as to this allegation in the return demands strict proof; and she further denies that the best interest of the child will be promoted by refusing to return the custody of the child to its mother.

On March 8, 1948, Dr. Osterman filed a report of his examination with the circuit clerk. After detailing petitioner's history, which included reports from the Maryland mental institution, and information concerning her parents, the doctor found that the patient shows no evidence of mental disease or psychosis; that a blood Mazzini test negatived syphilis; that she did have a transient psychosis in April, 1947, from which she readily recovered within two months; that at present, she appears stable and well adjusted. This doctor was of the opinion that petitioner will not develop a recurrence unless subjected to unusual stresses and strains, and recommends the giving of the custody of the child to its mother.

During the period December 10, 1946, the birth of the child, and February 13, 1948, the date of the institution of the present proceedings, the department of public assistance had made inquiry into the petitioner's background, and had discouraged any effort to adopt on the part of respondents. It appears from such case history, which is in the record, that petitioner's parents were both syphilitic, and that the father (deceased in 1930) was an alcoholic. Petitioner's mother was committed to the asylum at Spencer during petitioner's childhood and was later transferred to the asylum at Weston.

It appears from the record that petitioner was born at St. Mary's, West Virginia, in 1921, that she is now over twenty-six years of age; that following her father's death she was removed to an orphanage at Elkins; that at the age of twelve she was taken into a foster home near Welch; that she finished Junior High School while there; that in 1942 she went to work in a laundry in Welch, and later in Stevens Clinic. While at the clinic she met Hader, 42 years of age. From there she went to Baltimore where she worked in the laundry and hospital of Glenn L. Martin Aircraft Company from August, 1944 to September, 1945; she and Hader, a soldier, were married at Welch in December, 1944. Petitioner states they separated because of her refusal to practice unnatural relations; that in 1945 she made a trip to Texas, where she met up with one Alvey, a printer by trade, and moved from place to place with him, working at times as a waitress; that in the latter part of 1946 she returned to West Virginia, and due to her pregnancy, sought assistance from the welfare agencies in the vicinity of Wheeling; that she was cared for during this time by welfare agencies; she gave birth to the child involved in this case on the 10th day of December, 1946, in Ohio Valley Hospital; that during convalescence in Florence Crittenton Home, she signed a paper, which, according to her and certain of the welfare workers, was for temporary custody and care of her infant child; that she returned to Maryland, which she claims as her legal residence since 1944; that there she met Wiley Lee Bell, a retired fireman, whom she later married. This man Bell assisted her financially in obtaining a divorce from Hader; that she got her divorce April 29, 1947; that on the following day she was committed to Spring Grove Hospital for the Insane at Catonsville, Maryland; she was released on July 2, 1947; that at the time she was committed she was "very delusionary and hallucinatory", and the diagnosis was "Schizophrenia, paranoid type". At the time of discharge twelve psychiatrists said she had fully recovered. It further appears that she married Bell on August 2, 1947, and according to her testimony she and Bell have

been residing in a home which, according to her statement, is jointly owned by them.

Wiley Lee Bell is 63 years of age, thirty-seven years the petitioner's senior. He is a retired fireman, and, according to the record, receives a yearly pension of $1400 per year. There is no evidence as to the value of the "home" or whether it has been paid for. Whether Bell has other property, the record is silent.

Depositions of certain neighbors of the Bells regarding petitioner's good moral character were filed on behalf of the petitioner. These depositions were to the effect that since the marriage of petitioner and Bell that petitioner seems to be a very good and upright person; that she conducts herself in an exemplary manner at all times; and that she is fond of children. The court heard testimony in chambers of the petitioner herself, Mrs. Eicholtz, one of the respondents, Grace McKisson, Superintendent, Florence Crittenton Home, and Mrs. Evelyn Creighton, who, at the time of testifying, was a district child welfare supervisor, and, as such, custodian of the files of Dorothy Hader, now Bell. The latter witness knew of the placement of the child in the Eicholtz home. She testified that "we thought they (Eicholtzes) were taking a great risk in adopting that child, because of the fact that the mother was in the hospital with a mental condition"; and, that the department was willing to let them adopt in so far as it had power.

As to the respondents, Mr. and Mrs. Eicholtz, they were found by the court to be people who are well able to take care of the child, that they are people of good character and of high repute, and that they have taken excellent care of the child. Petitioner admits that Mrs. Eicholtz and her husband have taken good care of the child and that they have "a fine, decent home."

The department of public assistance does not recommend the return of the child to the mother, who is reported as "a victim of schizophrenia" with "unstable emotions".

On August 3, 1948, the Court, after considering the testimony taken, certain depositions, and the exhibits filed and agreed and stipulated by the parties, including the report of Dr. A. L. Osterman, found that the petitioner was being "unlawfully deprived of the custody of her infant daughter * * * that the best interests of the infant * * * will be promoted by the delivery of the possession, custody and control of said infant to her mother", and "adjudged, ordered and decreed that respondents * * * deliver up possession, custody and control of said infant * * * to petitioner, Bertha Margaret Bell * * *".

This is a case of custody and not one of adoption. The petitioner did not execute such a release that would amount to a relinquishment of all rights to the child, as required by Chapter 19, Article 3, Acts 1945 West Virginia Legislature, and thus form a basis for adoption of the child by the Eicholtzes. Habeas corpus is the proper remedy to settle disputes which involve the custody of infant children. *State ex rel. Lipscomb v. Joplin,* 131 W. Va. 302, 47 S.E. (2d) 221; *Pukas v. Pukas,* 129 W. Va. 765, 42 S.E. 2d 11; *Cunningham v. Barnes,* 37 W. Va. 746, 17 S.E. 308; *Green v. Campbell,* 35 W. Va. 698, 14 S.E. 212.

While the right of the parent to the custody of his child is founded on both natural and statute law he can, by fair agreement, transfer its custody to another. *Cunningham v. Barnes, supra.* And, where such other has acted to manifest interest and welfare of the child, the natural parent may not reclaim custody unless he can show that the child's welfare, moral and physical, will be materially promoted. *State ex rel. Lipscomb v. Joplin, supra.* The court need not deliver the child into custody of the natural parent, but may permit it to remain in such custody as its welfare at the time appears to require. Pt. 3 Syl., *Cunningham v. Barnes, supra.*

At the time the child was left with the department of public assistance its mother knew that it would necessarily be placed in a foster home for a time. Considerable time

elapsed with no apparent effort to regain its custody. The mother, petitioner, for a while, especially after meeting Bell, was interested in obtaining a divorce from her husband, Hader. Then she became mentally unbalanced, and was committed to a Maryland mental hospital for two months. During this mental derangement it appears that Bell visited Wheeling and made inquiry concerning the child. Some correspondence was had with the department. On August 2, 1947, petitioner and Bell were married. In the meantime the Eicholtzes were becoming more and more attached to the child and were contemplating beginning adoption proceedings. And, on February 13, 1949, the petition seeking habeas corpus was filed by petitioner herein.

The sole issue here resolves itself into this: Will the return of the child to its natural mother at this time be for its best interests. As held in Pt. 2, Syl., *State ex rel. Lipscomb v. Joplin, supra:* "In a contest involving the custody of an infant the welfare of the child is the polar star by which the discretion of the court will be guided."

It appears from the record that the circuit court as well as the petitioner herself recognize that the Eicholtzes are good, substantial people and are able to take good care of the child. Such being the situation, will a return of the custody of the child at this time to the petitioner improve the position of the child?

Even if we should assume from the record that the petitioner is now an upright, well behaved, good and moral woman, and able to properly care for her child, as the circuit court indicated in a memorandum filed in the record, we have grave misgivings regarding the finding that she is "now of sound mind". Although Dr. Osterman did report to the court that petitioner shows no evidence of mental disease or psychosis, and that she does not have syphilis, he does not negative a possible recurrence of her mental disease, but concludes with an opinion that petitioner will not develop a recurrence unless "subjected to unusual stresses and strains".

While the petitioner testified that she is a joint owner in the house in which she and her husband now reside, there is nothing to indicate its value, or whether it is free of liens. In view of Bell's age, petitioner's present financial situation may revert, in case of the former's death, to that in which she found herself at the time of the birth of her child. Such a situation, in view of her past background, even according to Dr. Osterman, could very easily cause a recurrence of her former mental condition. Enough time has not transpired to preclude a possible recurrence.

In view of the foregoing we are of opinion that the judgment of the circuit court must be set aside and the respondents permitted, at least for the present, to retain the custody and control of the child. The judgment of the Circuit Court of Brooke County awarding the custody of the child to the petitioner, Bertha Margaret Bell, is reversed and the case remanded with directions that the writ be discharged.

*Judgment reversed; case remanded with directions to discharge the writ.*