MAXINE MARION SAYRE DAVIS

*v.*

JACK L. HADOX AND DOROTHY HADOX

(No. 12009)

Submitted April 19, 1960.      Decided May 24, 1960.

234

*A. Blake Billingslea, Tusca Morris,* for plaintiffs in error.

*Herschel Rose, J. Scott Tharp,* for defendant in error.

GIVEN, JUDGE:

The petition of Maxine Marion Sayre Davis, filed in the Circuit Court of Marion County, against Jack L. Hadox and Dorothy Hadox, husband and wife, prayed that a writ of habeas corpus ad subjiciendum be directed to defendants, requiring them to deliver custody of an infant daughter of petitioner, Donna Lee Sayre, to petitioner. The trial court, after considering evidence adduced by the parties, awarded custody of the child to petitioner.

The child was born July 12, 1952, out of wedlock, in a foundling home in Pittsburgh. After eleven days, the home, with the understanding of the mother, made an arrangement with the Department of Public Assistance of West Virginia, whereby the child was taken to Fairmont, West Virginia, by the mother, and placed in a foster home. The mother of the child agreed to, and apparently did, reimburse the Department of Public Assistance for the sum paid to the foster home for the care of the child. After two and one half months the child was, by the Department of Public Assistance, with the consent of the mother, removed to the home of defendants, where it remained for approximately fourteen months. The mother reimbursed the Department of Public Assistance, at least in part, for the amount paid by it for the care of the child during the fourteen months. At the end of the fourteen months, petitioner took the child from the home of

defendants to the home of her brother, where petitioner was living, where it was kept for approximately one month, until November 30, 1953. There is testimony to the effect, though denied, that defendants, at the time the mother took the child from the home, requested that they be permitted to permanently have the child, if the mother ever decided to permanently surrender its custody. The Department of Public Assistance apparently had no connection with the placement of the child subsequent to the time the mother removed it from the home of defendants to the home of the brother. The record discloses no agreement of the mother to transfer, either temporarily or permanently, custody of the child to the Department of Public Assistance.

On November 30, 1953, the mother telephoned a Mrs. Vernon, stepmother of Mrs. Hadox, that she, the mother of the child, desired that defendants come to the home where the child was being cared for and take it into their custody. The litigants have different versions as to the purpose and effect of the telephone conversation, petitioner contending that it was understood that defendants were to have only temporary custody of the child, and defendants contending that it was definitely understood that they were to have permanent custody.

The message delivered by telephone to Mrs. Vernon was immediately conveyed to defendants who, on the same evening, went to the home of the brother and found the child in the care of a Mrs. Sayre, sister in law of petitioner, and its clothes, ready for delivery to defendants. It has remained in the home of defendants since November 30, 1953. The mother, at the time of delivery of custody of the child to defendants, absented herself from the home of her brother, apparently for the purpose of avoiding observance of the actual delivery of the child.

Petitioner, on being asked as to the telephone conversation concerning delivery of the child to defendants, stated: ''I explained the conditions as they

were. I told her I had no money. I did not want to put the child in an institution of any kind. I asked her if she would take the child temporarily. I explained to her my financial condition. I said I would do what I could. She said that was all right.'' Though petitioner testified that the telephone conversation was with Mrs. Hadox, it is clearly established that it was with Mrs. Vernon. Mrs. Sayre, sister in law of petitioner, who was present at the time the mother of the child telephoned the request for defendants to come for the child, was asked: ''On that occasion, did you hear what was said by Maxine in that connection?''; to which she answered: ''Yes, she explained the circumstances and asked them if they would take Donna Lee and take care of her until circumstances permitted her to take her back.''

Mrs. Vernon, stepmother of Mrs. Hadox, who received the telephone message from the mother, testified that the mother stated that ''she would like for Dorothy to come and take the baby or the child, take her as her own; that things couldn't go on like they were; that there had to be some changes''. Mr. Vernon, father of the defendant Mrs. Hadox, was present with Mrs. Vernon at the time of the telephone conversation and was asked: ''What was the substance of that conversation between your wife and this woman on that occasion?'', to which he answered: ''She called and wanted to know if Dorothy and Jack would like to take Susie back and keep her; she told her yes, she would be glad to take her and we would be there immediately and take her''. The defendant, Jack L. Hadox, testified to the effect that it was their understanding that when he and Mrs. Hadox took the child the last time, they were to ''keep her as our own''. The defendant Mrs. Hadox testified that at the time the child was delivered to defendants, on November 30, 1953, Mrs. Sayre, who delivered the child for the mother, was told to thank the mother ''for letting me have the child to keep her as our own child''. The statement is denied by Mrs. Sayre. Other testimony,

vigorously denied, though to some extent corroborated, is to the effect that the mother made certain statements, about 1957 or 1958, indicating that she had at the time of the delivery of custody of the child intended defendants to permanently retain its custody.

Two qualified witnesses, not mentioned above, testified to the effect that the best interests of the child required that it be reared in the home of defendants. Defendants were precluded by the trial court from producing other testimony to like effect, but no witness was produced by petitioner who denied the testimony offered by the two witnesses. The trial court stated: "I want the record to show as far as this Court is concerned this child is in a perfectly fine good home; it has been well cared for; just as good or better than it would in Maine, so far as I am concerned, and the people in it."

The mother of the child was thirty years of age at the time of the taking of the depositions. Prior to the birth of the child involved she gave birth to an illegitimate boy, May 29, 1949, the father of both children being a married man. The boy was placed in a home for care and subsequently a nonsupport proceeding was prosecuted against the father, wherein the father agreed, September 15, 1952, to pay the sum of thirty five hundred dollars for the support of the boy, to be paid in monthly sums of fifty dollars. Subsequently the mother received from the father, on the contract, at least, the sum of fifteen hundred dollars and the sum of four hundred dollars, part of which was used by her to pay for the care of the boy and to reimburse the Department of Public Assistance for certain sums expended for the support of the child here involved, before November 30, 1953. Apparently the mother attempted to obtain no support from the father for the child here involved. It is clear that petitioner contributed nothing toward the care or support of the child here involved subsequent to November 30, 1953, and that defendants requested no assistance as to such care or support. No arrange-

ment as to such care or support was made by the parties at the time the child was last delivered to defendants.

There appears no question that the petitioner was in extremely necessitious circumstances at the time of the transfer of the child, November 30, 1953, and before and after. Her father and mother were in need of nursing and, perhaps, financial assistance. She was attempting to furnish such care. Her mother died August 25, 1956. Petitioner, on November 13, 1956, was married to Tarrance N. Davis, age twenty nine years, now a staff sergeant in the United States Air Force, stationed at the air force base in Maine. He receives monthly pay of two hundred thirty eight dollars, after deduction of certain allowances. The petitioner and her boy reside with him. He is desirous of adopting both children.

Though the defendants, and their place of residence not far distant from where petitioner resided a large part of the time, at least, were well known to petitioner, she made no effort to see the child until about June, 1958. Apparently Mrs. Hadox received one letter from petitioner sometime in 1954, but no other correspondence appears to have been had between the parties until sometime in 1957. The letters, exhibited in evidence, until near the time of the demand of petitioner for the return of the child, in 1959, seemed to indicate the only real concern of the mother to be that the child be informed of its natural mother. The inquiries by the mother apparently arose in connection with a claim made by the husband of petitioner concerning a deduction for the child in connection with his personal income tax report for the year 1956, and an additional allotment requested by him from the military authorities, based on expected custody of the child. In such letters petitioner did not demand custody of the child, or expressly contend that the custody of defendants was only temporary, but did offer to deliver unto defendants part of the additional allotment if obtained, for support of the child. Though facts have been

boreingly detailed, justifiable only because of the delicate nature of the matters involved, other facts appearing from the record will be mentioned in discussion of the issues.

Though numerous pertinent contentions are ably discussed in the briefs, we believe that answers to all controlling questions will be made apparent by a determination of issues relating to the existence of an express contract granting permanent custody of the child to defendants, and whether the best interests of the child, the polar star principle, require that custody of the child be returned to petitioner.

The trial court, near the beginning of the cross-examination of the first witness, announced: "The Court is only interested in the arrangement by which this child lived and what has been done in getting it back, if anything. That is the only issue before this Court. Please confine your questions to the issue. The only issue is the arrangement between these families about the custody of this child." Later in the trial, after the court had indicated that it did not desire to hear testimony concerning the character of the home of defendants, counsel for defendants asked: "Would it be proper to ask questions of competent people who know all of these things, as to their opinion?"; whereupon, the court stated: "I will let you put any witness on because it will not be contradicted, I am sure. As far as this Court is concerned, I don't want the benefit of any neighbors, friends or relatives to tell me what would be the best interests of this little seven year old girl. The Court saw the girl and he has heard this testimony and he knows in his own mind what the best interests of this child would be. And I will say there is no difference in the homes as far as this Court is concerned. If there is other evidence, produce it". As before noted, the court did permit two witnesses offered by defendants to testify as to the character of the home of defendants and the nature of the care afforded the child by defendants, and what would promote the interests of the child, but refused the offer

of defendants to introduce other witnesses who would testify "as to what course would promote the best interests of the child", announcing: "And the Court does not permit you to offer any additional testimony along this line, because there is no evidence to contradict any evidence, or the two witnesses who testified it would be to the best interests of the child to let her stay where she is. The Court doesn't want any further testimony on that point." Thus, it would appear that the trial court gave controlling effect to the existence or nonexistence of an express contract, rather than the polar star principle, to be later considered in this opinion.

Looking alone to the testimony of the several witnesses relating directly to the telephone conversation concerning the nature of the agreement whereby the infant was delivered to defendants on November 30, 1953, there is sufficient evidence to support the final conclusion of the trial court. Facts and circumstances clearly established by the record, or admitted, however, appear to make it certain that the understanding between the parties was in accordance with the contention of defendants. It can not be overlooked that defendants, on a call from petitioner, immediately went to the home of petitioner, found the child ready to be delivered to defendants pursuant to directions of petitioner, and that delivery occurred within an hour or so after defendants received the call. Though on the previous occasion, when the child was delivered to the custody of defendants, proper arrangements concerning the cost or expenses of its care had been made by petitioner, on the last occasion no such arrangement was made, was not even considered, not even mentioned by defendants. For approximately five years petitioner never attempted to visit the child, though in a letter dated May 19, 1954, Mrs. Hadox advised her that "you are welcome to come down any time you want to & bring your mother along". Petitioner never offered to make any contribution toward its care or expenses, and very seldom inquired as to

its welfare. On the other hand, the defendants, at their own expense, provided the necessary home and care for the infant, without even suggesting that petitioner assist in any manner. The four letters of petitioner exhibited in evidence, the first dated March 20, 1957, furnish no definite indication as to what the original understanding of the parties was. In truth, they seem to indicate that petitioner's principal interest was to obtain the income tax deduction and the additional allotment. The letters only indicate that a part of any allotment granted would be forwarded to defendants to be used for the care of the child. Later, petitioner requested temporary custody of the child, asking to be permitted to take it to her home in Maine, and, on refusal by defendants, still later, in 1959, demanded its custody. In *Lipscomb v. Joplin,* 131 W. Va. 302, 47 S. E. 2d 221, the Court said: "* * * It is unlikely that strangers, such as the Joplins, would agree to keep the baby temporarily without some arrangement as to the time their posession should continue or the amount they should be paid on some periodic basis for the care and the attention which they should be required to give; but nothing of that kind was mentioned or discussed. After the child was taken, the relator, though she was able to, and did, engage in other errands, made no effort to see her or to ascertain her whereabouts or her condition until she demanded the baby's return on the evening of December 30, 1947, when she was accompanied by her brother in whose home she is now living. The evidence presented upon this issue sufficiently shows that the relator agreed that the respondents should have the unqualified possession of the child and that, in accordance with that agreement, she transferred to them her right to its custody." In *State ex rel. Harmon v. Utterback,* 144 W. Va. 419, 108 S. E. 2d 521, we held: "4. When a parent, by agreement or otherwise, has transferred, relinquished or surrendered the custody of his or her child to a third person and subsequently demands the return of the child, the action of the court in determining whether the custody of the child shall remain in

such third person or whether the child shall be returned to its parent depends upon which course will promote the welfare and the best interests of the child; and the parent will not be permitted to reclaim the custody of the child unless the parent shows that such change of custody will materially promote the moral and physical welfare of the child.''

We do not overlook the natural and statutory rights of a parent to the custody of his or her child. Notwithstanding such rights of parents, it has always been recognized in this State, perhaps in every state, that parents, because of various circumstances and conditions, may by agreement or otherwise transfer, relinquish, or surrender such custody to another person, if not against the welfare of the child, or if not made for the purpose of avoiding a duty imposed by law. See *Lucyk v. Brawner,* 144 W. Va. 690, 110 S. E. 2d 739; *Stout v. Massie,* 140 W. Va. 731, 88 S. E. 2d 51; *Hoy v. Dooley,* 144 W. Va. 64, 105 S. E. 2d 877; *Green v. Campbell,* 35 W. Va. 698, 14 S. E. 212; *Rust v. Vanvacter,* 9 W. Va. 600; 67 C.J.S., Parent and Child, Section 15b. In the instant case the transfer of the child is admitted, and it is clearly established that such a transfer was made necessary by the circumstances of petitioner, though such circumstances were no doubt beyond her control; but was then necessary for the welfare of the child. Though the facts establish that the understanding and intention of the parties at the time of delivery of the child were to the effect that defendants were to take and retain permanent custody, such agreement or intention can not control if the best interests of the child require that its custody be returned to petitioner.

In determining that question, only one conclusion can be reached. As before pointed out, the trial court found, as the evidence clearly established, that the home where the child has remained all its life, except a few months shortly after its birth, is a ''perfectly fine good home'', and that the child ''has been well cared for''. That the home and circumstances of peti-

tioner may be equal to those of defendants does not control the question of whether a change from one home to the other will promote the interests of the child. The mother, having voluntarily "transferred" the custody to another, and permitted it to remain with such other person, in the circumstances of this case, must abide by a clear determination of what is for the best interests of the child. In *Cunningham v. Barnes,* 37 W. Va. 746, 17 S. E. 308, we held: "3. When a parent has transferred to another the custody of his infant child by fair agreement, which has been acted on by such other person to the manifest interest and welfare of the child, the parent will not be permitted to reclaim the custody of the child, unless he can show that a change of custody will materially promote his child's welfare moral and physical." See *State ex rel. Harmon v. Utterback, supra; Bell v. Eicholtz,* 132 W. Va. 747, 53 S. E. 2d 627; *Lipscomb v. Joplin, supra; Green v. Campbell,* 35 W. Va. 698, 14 S. E. 212.

Admittedly, it is difficult to disassociate the cherished and tender emotions of a parent toward his or her child from facts relating to the best interests of the child. The decisions, however, make our duty clear. In circumstances of this case the best interests of the child must be considered. The facts here leave no serious doubt. They are hardly in dispute. The child born July 12, 1952, has been cared for in the home of defendants all its life, except about three months. It has been in petitioner's custody only about one month. There is nothing in the record to indicate lack of ability on the part of defendants to properly rear the child, nor is there any evidence of any neglect at any time on their part as to its care, training or education but, on the contrary, as the trial court found, the child is loved and has been properly cared for by defendants. To compel its removal from all whom it has known and learned to trust to a different home, to the care of individuals strangers to it, from all previous acquaintances in school or otherwise, would, almost certainly, prove detrimental and prejudicial to

its best interest. In *Green v. Campbell*, 35 W. Va. 698, 704, 14 S. E. 212, this Court, considering a similar question, said: "* * * This little boy, now nearly five years old, is himself, no doubt, attached to his grandmother—he has known no other mother; to his grandfather; to his grown-up uncle; to the quiet, sober old homestead with its abounding comforts and plenty. Human nature and human experience are parts of the common law; there is no need that this child should speak. Can the plaintiff take him to a better home— to one as good, for his present moral training and his physical comfort, present and to come, for some years, at least? What facts appear in this record that should induce us to drag him away to the home of a stranger, of a young married woman, good and amiable, in every way worthy of high esteem, but none the less a stranger * * * Plaintiff does not say that this new home of his is a better one for this child. He does not pretend to tell us why, or show us how, it is a better home than the present one, or that he is more able, or as able, to supply him in his tender years with what he needs as he is now supplied with and sure to receive, for some years, at least  * * *". See *Lucyk v. Brawner,* 144 W. Va. 690, 110 S. E. 2d 739; *Stout v. Massie,* 140 W. Va. 731, 88 S. E. 2d 51; *State ex rel. Cooke v. Williams,* 107 W. Va. 450, 148 S. E. 488; *State ex rel. Palmer v. Postlethwaite,* 106 W. Va. 383, 145 S. E. 738; *Connor v. Harris,* 100 W. Va. 313, 130 S. E. 281; *Cunningham v. Barnes,* 37 W. Va. 746, 17 S. E. 308.

The judgment of the Circuit Court of Marion County must be reversed, and the writ issued by that court discharged.

*Reversed.*