PEGGY ANDERSON

*v.*

ELMER WOODS AND VERGIE WOODS

(No. 12984)

Submitted February 2, 1971.          Decided March 9, 1971.

*H. D. Rollins,* for appellant.

*Leo Catsonis,* for appellees.

BERRY, JUDGE:

This habeas corpus proceeding was instituted in the Court of Common Pleas in Kanawha County by the petitioner, Peggy Anderson, to regain custody of her infant son, David Shawn Anderson, from the respondents, Elmer and Vergie Woods, who had been given custody of the infant son after its birth. After the hearing of the matter in the Common Pleas Court,

that Court decided against the petitioner and dismissed the petition. The petitioner then appealed to the Circuit Court of Kanawha County which Court refused the appeal, stating that the judgment of the Common Pleas Court was plainly right. The petitioner then applied for an appeal in this Court from the judgment of the Circuit Court, which was granted July 13, 1970. Leave to move to reverse was granted September 14, 1970, and the case was submitted for decision on arguments and briefs of the parties at the January, 1971 Term of this Court.

Two questions are involved in this case, namely, whether the petitioner entered into an oral agreement to permanently give up her child, and whether it would be for the best interest of the child to return it to the petitioner regardless of any oral agreement.

The issues in the case were raised by an answer filed by the respondents in which they deny petitioner's allegations that they had only temporary custody of the child and that she is a fit person to have custody of the child. A replication to the answer was filed by the petitioner.

It appears that the child in question is a second son and was born on October 14, 1969, in Cleveland, Ohio, where the petitioner was living at that time. Although the petitioner was not sure of the date of her marriage, she thought she was married in August, 1967, to a man by the name of Anderson, who later left her after a first child was born. This child was named Joseph and is now living with her.

Although the petitioner states that her husband is the father of the infant involved in this case, there appears to be some question relative to this matter, because the petitioner stated at the hearing that her husband left her some time in September, 1968, over a year before the birth of the child. The petitioner was 23 years old at the time of the birth of the second child, apparently had no training of any kind and was at that time receiving welfare benefits in Cleveland. The contest over the custody of this child is somewhat of a family affair. The respondents, Elmer and Vergie Woods, are the parents of the wife of the petitioner's brother.

During the pregnancy of the petitioner in the summer of 1969, she was apparently in dire circumstances and became concerned with the monetary problems confronting her. Being on relief in Cleveland, Ohio, at the time, she discussed the situation concerning the disposition of the child with her sister-in-law, Mary Ann Slater, who lived near Charleston. She stated that she visited her sister-in-law and saw the Woods family who apparently were acting as foster parents under a foster home program for the West Virginia State Department of Welfare. They had four children of their own and maintained a normal household. At any given time they might have four or five children left with them by the Department of Welfare. However, the transaction involved in this case was a private arrangement between the parties, and the State Department of Welfare was not involved.

During the petitioner's visit to Charleston in the summer of 1969, she claimed the only arrangement made was for temporary disposition of her unborn child. She admitted that she had in.mind putting the child up for adoption in Cleveland, and that Mrs. Slater talked her out of this, whereupon, an arrangement or agreement was made for Mrs. Woods to have the child. She denies making any statement that she did not want the child.

After the petitioner returned to Cleveland she kept in touch with the people in West Virginia, but contends that it was with reference to some temporary disposition of the child involved. On one or more occasions she resided at an address in the name of a male friend referred to by her as her "landlord".

After the child was born petitioner called Mrs. Slater to inform her of the birth and advised her that she would have neither food nor clothing for the baby when she left the hospital. Mrs. Slater went to Cleveland, furnished food and clothing, and the petitioner gave her the baby. The petitioner, with a male friend by the name of Warren Beckwith, went to the bus station with Mrs. Slater to whom she then gave various records pertaining to the baby and promised to send the birth certificate later. Mrs. Slater brought the baby to Charleston

and delivered it to the respondents, in accordance with the prearranged agreement.

Although the testimony is confusing, apparently some weeks later an arrangement was made by the mother with the respondents to meet her at the bus station on December 6, 1969, with the child. The respondents went to the station where they remained until 2 o'clock a.m., but were unable to locate her. She did appear in Charleston the next day with the "landlord", Warren Beckwith.

The evidence is conflicting as to what transpired on this occasion of the petitioner's trip to Charleston. The respondents' witnesses state that the petitioner said the only reason she wanted the child back was to get more welfare benefits. The petitioner denies this. She admitted that Mrs. Woods told her the baby had a cold and that it was dangerous to take it out. Apparently Mrs. Woods was under the impression that the petitioner would not come back for the baby until spring. However, she left Mrs. Woods' home and saw an attorney on the same day and arranged to have this habeas corpus petition filed in order to obtain the custody of the child.

Mrs. Woods testified that the petitioner started talking about her difficult conditions in May, 1969, stating that she was going to give the baby up and later promising her that she could have it. Mrs. Woods stated that she questioned the petitioner to make sure she was going to give the baby up and that petitioner, although not wishing to keep the child, agreed not to put the baby up for adoption in Cleveland; whereupon she agreed to raise the baby and to have arrangements made for someone to go to Cleveland to get the baby after its birth. Mrs. Woods further stated that after the baby was born the petitioner called and asked to have someone come after it. It was then that Mrs. Slater, after receiving $150 from her mother, Mrs. Woods, for food and clothing for the baby, went to Cleveland to get it.

In October Mrs. Woods received a telephone call from a social worker in Cleveland inquiring as to when she was

coming to Cleveland to get the baby and she told the worker that she already had the baby in Charleston. Apparently, from the telephone conversation, the petitioner had told the social worker that the child was in Cleveland in order to obtain more welfare benefits.

A letter was introduced into evidence which Mrs. Woods had written to the petitioner on December 3, 1969, to the effect that she thought petitioner was going to try to get the baby back and in which an attempt was made to persuade her not to, indicating, according to petitioner, that Mrs. Woods knew that she did not have permanent custody of the child. Mrs. Woods explained that the reason she wrote the letter was in an attempt to persuade the petitioner to leave the baby with her, because the petitioner's brother, Frank Slater, had warned her that she could not depend on his sister, who, he said, would make trouble and try to rescind the agreement. However, the letter plainly states that she did not know what she was going to do when the petitioner took the child back, and that she just planned on keeping him until the petitioner could get on her feet; that she would not try to keep petitioner from regaining her baby but wanted her to wait as long as possible before taking him.

Mrs. Woods testified that she had a lengthy conversation with the mother when she came to Charleston December 7, 1969, and that she talked the petitioner into leaving the child with her until the next spring or summer. She stated the petitioner told her at that time she was in love with somebody by the name of "Chuck" and wanted to get married as soon as he got out of the hospital where he was recovering from a gunshot wound he had received while he and the petitioner were in a barroom and that this man would take care of her children. Also, she said that petitioner gave as a reason for wanting to take the child back that she could get more welfare money.

The petitioner's sister-in-law testified that when the petitioner came to West Virginia in the summer of 1969, she told both her and her mother that she did not want the baby and asked her mother, the respondent, to take it. She further

stated the petitioner consulted a West Virginia welfare worker who advised her to give the child up, and that the petitioner agreed that was the best thing for her to do. Mrs. Slater said that when she went to Cleveland after the baby the petitioner called her mother and confirmed the agreement that the child was to go to her. Mrs. Slater testified also that the petitioner said when she came to Charleston in December, 1969, that the reason she wanted the baby back was to get more money from the welfare department in Cleveland.

Considerable testimony appears in the record with regard to petitioner's character and fitness to have custody of the child involved, all of which was objected to by her attorney, on the theory that the only thing involved was the existence of an agreement.

The combined testimony of Mrs. Woods, of the petitioner's brother and of her sister-in-law was to the effect that the petitioner used profane language, was a harsh mother and "ran around" too much, and admitted at times living with a man to whom she was not married. Her brother testified that he would not want her to raise one of his children. Witnesses who testified on behalf of the respondents stated they were fit and proper people to have custody of the child.

There is no question from the evidence in this case but that some kind of an oral agreement was made by the petitioner to give the child in question to the respondents to keep, which was done. It is questionable as to whether this agreement was for permanent or only temporary custody of the child.

Although a parent has a natural right to the custody of his or her infant child such custody will be denied where the parent is unfit because of misconduct, neglect, immorality or where the custody has been relinquished or surrendered. But the controlling principle in determining the custody of the child is the welfare of the child. *State ex rel. Kiger v. Hancock,* 153 W.Va. 404, 168 S.E.2d 798. The rights of a parent are subordinate to the right of an infant. *Stout v. Massie,* 140 W. Va. 731, 88 S.E.2d 51. This principle is clearly stated in point

2 of the syllabus in the case of *State ex rel. Lipscomb v. Joplin,* 131 W.Va. 302, 47 S.E.2d 221, wherein the following language appears: "In a contest involving the custody of an infant the welfare of the child is the polar star by which the discretion of the court will be guided."

In a habeas corpus proceeding involving a disputed custody where parties other than parents have accepted the custody of a child, the burden is on the natural parent to show that return of the child will be for the best interest of the child, morally and physically. *Bell v. Eicholtz,* 132 W.Va. 747, 53 S.E.2d 627.

The petitioner in the case at bar had no permanent residence in Cleveland where the child in question was born. She had no means of livelihood and was receiving welfare benefits. It is apparent from the record that the petitioner was unable to furnish a stable home and lived under questionable circumstances, and her conduct by being in a barroom where she said the man she wanted to marry was shot was certainly not conducive to the best interest of any child, morally or physically. It is also apparent that she did not have the means with which to properly care for the child at the time he was born, and the evidence does not indicate that she is in any better financial condition now than she was then.

Under the circumstances of this case, the transfer of the custody of the child involved by the petitioner to the respondents was entirely proper and was for the best interest of the child; and when this was done and acted upon by the respondents, she cannot reclaim the custody of the child unless she can show that a change of the custody will materially promote her child's welfare, morally and physically. *Cunningham v. Barnes,* 37 W.Va. 746, 17 S.E. 308; *State ex rel. Harmon v. Utterback, et al.,* 144 W.Va. 419, 108 S.E.2d 521; *Davis v. Hadox,* 145 W.Va. 233, 114 S.E.2d 468; *Lucyk v. Brawner,* 144 W.Va. 690, 110 S.E.2d 739. This principle is succinctly stated in point 3 of the syllabus of the case of *Cunningham v. Barnes, supra,* and quoted in point 2 of the syllabus of the case of *Davis v. Hadox, supra,* in the following words: " 'When a parent has transferred to another the custody of his infant child

by fair agreement, which has been acted on by such other person to the manifest interest and welfare of the child, the parent will not be permitted to reclaim the custody of the child, unless he can show that a change of custody will materially promote his child's welfare moral and physical.' "

The evidence is clear and uncontradicted that the respondents are fit persons to have custody of the child involved in this case. They are of good moral character, have an adequate and proper home and are financially able to care for the child.

The case of *Pierce v. Jeffries*, 103 W.Va. 410, 137 S.E. 651, 51 A.L.R. 1502, has been relied upon by the petitioner. This case is not authority to support her contention, because there was no agreement of any kind made to relinquish the custody of the child in that case. It was left by the mother with her parents, without the knowledge of the relationship, and it was then given to third party strangers to the mother. It was held in that case that the mother could recover the custody in a habeas corpus proceeding from strangers who had acquired the custody of the child without her knowledge.

It clearly appears from the evidence in the instant case that the welfare of the child in question would be better served if the custody is left with the respondents because of their stability, morality and financial ability, which are not questioned, whereas this is not the case with the petitioner.

The determination of the right of parties to the custody of an infant is within the sound discretion of a trial court and the decision will not be disturbed unless such discretion has been abused. This principle clearly appears in point 1 of the syllabus of the case of *Lucyk v. Brawner, supra,* which reads as follows: "The determination of the right of the parties in a habeas corpus proceeding to the custody of a child lies within the sound discretion of the trial court and such determination will not be disturbed on appeal in the absence of a showing that such discretion has been abused."

For the reasons stated herein, the motion to reverse is denied and the judgments of the Court of Common Pleas of

Kanawha County, and the Circuit Court of Kanawha County are affirmed.

*Motion to reverse denied and judgments affirmed.*