# CHARLESTON.

ETHEL WALKER *v.* C. C. WALKER

(No. 6694)

Submitted November 12, 1930.   Decided November 18, 1930.

*W. A. Thornhill, Jr.,* for appellant.
*Grover C. Trail,* for appellee.

LIVELY, PRESIDENT:

The plaintiff, Ethel Walker, appeals from a decree which awarded to her husband a divorce from bed and board and temporary custody of their three children. C. C. Walker, the husband, in response to the charges of cruelty and desertion alleged in the wife's bill, filed a counter suit, charging his wife with desertion, adultery, cruelty, and improper associations.

The charge of adultery was not sustained by the evidence, but the divorce commissioner found, and the chancellor so affirmed, that plaintiff had deserted her husband.

The parties to the suit were married in 1920. Before coming to the town of Beckley, Raleigh County, West Virginia, where they resided at the time of the alleged desertions, they had lived in several smaller West Virginia towns, among them Besoco and Shady Springs. They were a quarrelsome couple, the wife attributing their strife to defendant's selling liquor and failing to provide food and clothes for his wife and children, while defendant says the trouble was occasioned by the wife's association with her sister, Mary Basham, a person of questionable reputation. The wife is depicted as a woman of fiery and ill temper, who berated her mate, and who frequently used vile and vulgar language against her husband and in the presence of their three children, ages 9, 6 and 4, respectively, at the time of the divorce proceedings. The husband earned his livelihood, at least during a portion of their married life, by selling liquor, the wife assisting in pouring the liquid when commanded to do so by her husband.* On April 12, 1929, the wife was arrested on a warrant issued by her husband apparently for mistreating defendant's daughter, a child by a former marriage; the wife was acquitted, and when she returned to her home, defendant announced he was moving to Besoco and asked plaintiff, "Are you going with me?" Plaintiff replied that she was not, but asked that she be permitted to keep her children; and, during the time the household goods were being placed on the truck, when plaintiff took her youngest child into the house, defendant told his wife that she "had better not start anything, it wouldn't be good for her." Defendant moved to Besoco and occupied a house with his brother.

Plaintiff's reason for not moving to Besoco was that she was afraid to live with her husband any longer. To justify this attitude, she relates several incidents of personal violence committed either by her husband or in his presence. On one occasion, plaintiff testifies that defendant bit her on her head, fell upon her and "mashed her." Plaintiff's sister who examined her immediately after the altercation, saw evidence

of the bite. Defendant attempts to becloud plaintiff's version by saying that his wife attempted to hit him with a box of salve and that he became provoked when she jumped on his back. On another occasion, defendant brought a man, Dora Meadows, to his home. Both had been drinking. At the request of the husband, Meadows attempted to make plaintiff take a drink of liquor. Later, the husband insisted that Meadows "hug" her, and plaintiff relates that "he left places on my arm where blood came out" when she attempted to free herself. Defendant explains that his wife enjoyed her first scuffle with Meadows, but became angry "when he got the best of her" in a second scuffle, and that defendant then told Meadows not to hurt her. A third occurrence took place on one of the streets in Beckley just a few days before defendant moved to Besoco. Defendant met his wife and her sister, Mary Basham, to whom the husband objected because of her reputation, grabbed plaintiff and pulled her down the street. Some one other than plaintiff had him arrested for assaulting his wife; and although he admits he was fined for the assault, he explained that he was fined for being disorderly and acquitted on the charge of assault. Defendant admits that he threatened to divorce plaintiff if she went to Mary Basham's home. He admits offering money to two persons "if they would get next to (his) wife" and let him catch them in an adulterous act. He admits that an attorney had advised him that if he moved to Besoco and his wife refused to go with him, he would have grounds for a divorce. Defendant's reason for moving to Besoco was that he was working in Mullens, and that he had a car, and could drive to and from his work. Plaintiff contends that she, and not her husband, should have been given a divorce *a mensa,* and that the court erred in awarding temporary custody of the children to the father.

A husband has the legal right to determine the place of abode of his family, and it is desertion for the wife to refuse to follow the husband in his change of domicile if the husband requests her to follow him. Schouler Marriage, Divorce Separation and Dom. Rel. (6th Ed.) 1857; *Burke* v. *Burke,* 27 W. Va. 445. The power to change the abode, however, cannot be arbitrarily exercised nor used as a means of procuring dis-

solution of the marital relation. *Hall* v. *Hall*, 69 W. Va. 175. And, if the wife has justifiable cause for not going with her husband—cause which could be made the foundation of a judicial proceeding for divorce *a mensa et thoro*—desertion will not be imputed to her. *Reynolds* v. *Reynolds*, 68 W. Va. 15; *Vickers* v. *Vickers*, 89 W. Va. 236; *Alkire* v. *Alkire*, 33 W. Va. 517. In the instant case, defendant had sought the services of an attorney to determine if he had grounds for severing the matrimonial bonds. On April 12, 1929, he had his wife arrested on a charge which a court of law found to be an unjust one; and at that moment when he might have known that toward him hers could be but a feeling of antipathy and detestation, he announced his intention of moving. The grossly insulting act of one week before when he had dragged her down a public street was augmented by the humiliation of presenting herself in a court of law to answer a criminal act. The well of unhappiness, filled with bitter waters occasioned by the defendant, had reached the point of overflowing; and when defendant asked if she was going with him, her answer could have been naught but the negative. The defendant apparently remembered the words of his attorney; and having set his stage, what a propitious moment to bring about the breaking point—the refusal required to give him a ground for divorce. There is no evidence that he persuaded her to go with him; there is nothing to show that the erring husband attempted to make amends for his acts or to evidence some feeling to show that he had erred and was sorry. If he had been unkind and cruel to her at Beckley, what reason did she have to believe he would be otherwise at his new home surrounded by his relatives? His announcement of moving, coupled with the occurrences of the day, came at a time as to make his intent smack of suspicion, and the maxim "to obtain relief in a court of equity, the plaintiff must come in with clean hands" applies in divorce cases. *Hall* v. *Hall*, 69 W. Va. 175, 179. In the present case, it is hardly necessary to attempt a definition of "cruel and inhuman treatment." The acts complained of are such as fall within a definition of that term. Had we seen the parties and the other witnesses, as did the divorce commissioner, we may have been less certain of our

conclusion; but upon the record, we must disagree with the conclusions as established in the decree and to hold that plaintiff's duty of cohabitation was released by the cruelty of the husband; and since the acts of the husband are responsible for plaintiff's refusal to follow the husband to his new abode, desertion may be charged to the defendant. *Roberts* v. *Roberts*, 108 W. Va. 71.

Plaintiff contends that temporary custody of the children should not have been given to the defendant father. At the time of the divorce proceedings, the three children were being cared for by defendant's daughter (by a former marriage), fourteen years of age, who had already announced to her father that she would not attend school. The record discloses that while defendant resided at Shady Springs "one of the little girls" sold liquor. Before rendition of the decree, the chancellor permitted to be filed plaintiff's affidavit showing that defendant had been, on August 12, 1929, convicted and sentenced to six months' imprisonment for selling moonshine liquor, so that on the date of the decree defendant must have been incarcerated in the Raleigh County jail. Generally, in awarding the custody of children, the law favors the innocent spouse. *Rierson* v. *Rierson*, 107 W. Va. 321, 323. In this case, it is charged that the wife was cruel to her children, and that on one occasion, five years before the divorce trial, "she whipped him (her son) and he got white in the face." This is beside the point, since plaintiff, having no means of supporting her children, has introduced the evidence of her mother and brother, joint owners of a farm in Summers County, West Virginia, who have expressed their desire and willingness to have the children live on their farm, near which are a church and school, until they reach legal majority. Counsel for defendant argues that there is nothing in the record to show that the maternal grandmother is a fit and proper person to care for these children. We assume that in the absence of a contrary showing. Believing that the welfare of the children—the "polar star"—will be best subserved by granting the custody of the children to the maternal grandmother, Mary O. Massey, we are of the opinion that the evidence does not warrant the custody awarded by the decree.

The decree of the lower court granting to C. C. Walker a divorce *a mensa et thoro* and temporary custody of the three children is reversed, and the cause is remanded for the purpose of entering a proper decree consistent with the tenor of this opinion.

*Reversed and remanded.*