Dolores Holstein

*v.*

Kenneth Ray Holstein

(No. 12685)

Submitted January 23, 1968.     Decided March 12, 1968.

CALHOUN, JUDGE, dissenting.

*Cook & Hendricks, P. W. Hendricks, Jerry W. Cook,* for appellant.

*Donald E. Jarrell,* for appellee.

CAPLAN, JUDGE:

This is an appeal from a judgment of the Circuit Court of Boone County in a proceeding wherein the plaintiff, Dolores Holstein, sought to obtain the custody of her two minor children. At the conclusion of the evidence the court granted the plaintiff's prayer and awarded her the custody of said children. It is from this judgment that the defendant prosecutes this appeal.

Dolores Holstein, upon her complaint, was awarded a divorce from the defendant, Kenneth Ray Holstein, by an order of the Circuit Court of Boone County dated March 20, 1964. The ground upon which she sought and obtained a divorce was cruelty. The divorce order settled certain property rights of the parties and awarded custody of the two minor children born of that marriage to the plaintiff. The defendant was ordered to pay the sum of one hundred dollars per month for the support of said children.

On July 21, 1964, Kenneth Ray Holstein, the defendant below, filed a petition in the aforesaid court seeking a change of custody of his children. In his petition he alleged, among other things, that his children, Robert Holstein, age nine years and Kathryn Renee Holstein, age three years, were residing in a trailer with their mother, Dolores, and a man not her husband; that said man had a living wife; and, that Dolores and this man were living together falsely pretending to be husband and wife. Mr. Holstein further

alleged that he was willing and able to properly maintain, care for and educate his said minor children and prayed that custody of them be awarded to him. According to the certificate of counsel for the defendant, attached to the Notice of Motion for Hearing upon Petition, the aforesaid petition and a notice of hearing were served on Dolores Holstein by mailing copies thereof to her at her two last known addresses and by mailing one to her counsel in Madison, West Virginia. Dolores Holstein made no appearance at the hearing.

On August 5, 1964, a decree of modification was entered by the Judge of the Circuit Court of Boone County which contained, among others, the following findings:

"1. That all the allegations contained in defendant's said petition are true.

2. That plaintiff has been living in a manner which is inconsistent with the best interests of the children from a moral standpoint; that she has been cohabiting with a man, not her husband at the residence of said children.

3. That the best interests of said children require that they be taken from the plaintiff and given to the defendant."

The court then decreed that the defendant, Kenneth Ray Holstein, be awarded the sole care, custody and education of the two minor children born of the marriage which was dissolved by the aforesaid divorce. By this decree Dolores Holstein, the mother, was given visitation rights and according to the record she did visit her children as permitted by the decree.

This arrangement continued, Mr. Holstein having the custody of the children. By an order of said court entered on May 23, 1967, Dolores Holstein was permitted to file her petition praying for the entry of a decree changing the custody of her two infant children from her former husband to herself. In her petition she alleged, among other things, the change of custody of the children to her husband after the divorce and that "since the change of custody of said children from your petitioner to the defendant, the circumstances of the parties hereto have materially changed."

She alleges that she is employed as a teacher, that she is a member of a church, attends the church regularly, is living a good Christian life and is fully capable of giving her children the care, supervision and affection necessary to their proper development. Her petition then sets out certain changes in the circumstances of her husband since their divorce which will be alluded to hereinafter by relating some of the evidence adduced during the hearing.

Both parties agree that the welfare of the children is the paramount and controlling factor in resolving this contest for the custody of their children. As cogently stated in *Harmon* v. *Utterback,* 144 W. Va. 419, 108 S. E. 2d 521, "* * * in a contest involving the custody of an infant the welfare of the child is of paramount and controlling importance and is the polar star by which the discretion of the court will be guided." See also *Lucyk* v. *Brawner,* 144 W. Va. 690, 110 S. E. 2d 739; *Stout* v. *Massie,* 140 W. Va. 731, 88 S. E. 2d 51; *Smith* v. *Smith,* 138 W. Va. 388, 76 S. E. 2d 253; *Pugh* v. *Pugh,* 133 W. Va. 501, 56 S. E. 2d 901, 15 A. L. R. 2d 424; *Pukas* v. *Pukas,* 129 W. Va. 765, 42 S. E. 2d 11; *Boos* v. *Boos,* 93 W. Va. 727, 117 S. E. 616; 6 M. J., Divorce and Alimony, Section 58; Phelps, Divorce and Alimony in Virginia and West Virginia, 2nd Ed., Section 23-8; 39 Am. Jur., Parent and Child, Section 20.

As heretofore noted, the petition alleged, in support of her request for the custody of her children, that "the circumstances of the parties hereto have materially changed." Change in the circumstances of the parties alone is not enough. It must be shown that such change would materially promote the welfare of the children. *Pugh* v. *Pugh,* 133 W. Va. 501, 56 S. E. 2d 901, 15 A. L. R. 2d 424; *State ex rel. Lipscomb* v. *Joplin,* 131 W. Va. 302, 47 S. E. 2d 221; *Cunningham* v. *Barnes,* 37 W. Va. 746, 17 S. E. 308. In the last cited case the petitioner willingly relinquished and transferred the custody of his child, upon the death of his wife, the child's mother, to the respondents, the maternal grandparents. Some years later the petitioner sought custody of his child. Refusing his prayer the Court said in Syllabus No. 3, "When a parent has transferred to another the custody

of his infant child by fair agreement, which has been acted on by such other person to the manifest interest and welfare of the child, the parent will not be permitted to reclaim the custody of the child, unless he can show that a change of custody will materially promote his child's welfare moral and physical."

In the instant case the petitioner acquired custody of her children when she obtained a divorce from the respondent. However, by reason of certain indiscretions on her part, she had such custody taken from her. Now she asks that such custody be reinstated. As in the *Cunningham* case, it must be shown that the requested change of custody will materially promote the children's physical and moral welfare. The burden is on the petitioner to show that a change of the existing custody will be beneficial to the children. *Pugh* v. *Pugh*, 133 W. Va. 501, 56 S. E. 2d 901, 15 A. L. R. 2d 424. It is necessary, therefore, to examine the evidence to determine whether or not the petitioner has adequately borne that burden.

The uncontradicted evidence reveals that the Holstein children, Robert and Renee, have a comfortable and happy home in the custody of their father. This is not only un-contradicted but is reflected positively in the finding of the trial court. The learned judge said: "* * * the Court will commend Mr. Holstein for doing a good job and giving good care to the two children and from that point of view, I don't have any quarrel with Mr. Holstein at all. I think that all the evidence here is that his wife is a good woman and that they have a happy family life and are giving the children adequate care."

Let us consider the present circumstances of these children as revealed by the evidence. Their father, the defendant in this proceeding, some time after his divorce from the plaintiff married Maisie Cook. His present wife had three children by her former husband and one child was born of this marriage. Together with Robert and Renee there are six children. The home in which this family lives consists of eight rooms, a sun room and basement.

As related by several witnesses, there are four bedrooms and ample space for all.

The defendant, Kenneth Holstein, is a coal miner and earns from such employment a take home pay of from $116.00 to $140.00 a week. In addition to this, his wife receives approximately $344.00 a month from Social Security and the Veteran's Administration. Both the defendant and his wife testified that their income is adequate to properly raise and educate their family of six children. The defendant's wife, Maisie, testified that she loves Robert and Renee and treats them the same as her own. This was supported by the testimony of Robert Holstein and other witnesses. Furthermore, the children regularly attend and do well in school. Considering all of the evidence it appears that the trial court's finding that these children presently have a good home and a happy family life is correct and remains uncontradicted.

What does the petitioner's evidence reveal in support of her contention that a change of custody to her would be beneficial to her children? Two witnesses testified in support of the petition, the petitioner, Dolores Holstein Price, and Vance Price her husband. For the purpose of clarification, it should be noted that this proceeding was instituted by the petitioner prior to her marriage to Vance Price; that such marriage occurred on June 9, 1967; and that the hearing resulting in the award of custody of children to the petitioner was held on June 17, 1967. The petitioner by her testimony obviously seeks to show that the children would have a better home with her if the court were to grant her request. She testified that she is employed as a school teacher by the Logan County Board of Education and that her husband of eight or nine days at the time of the hearing was the chief engineer for Amherst Coal Company. She stated that she intended to establish a home at Man, West Virginia, although at that time she acknowledged that no such home had been found. She was then living in a four room apartment in the Town of Madison. Her husband, Vance Price, has two children by a former marriage, which was ended by divorce, who live with their mother in Orlando, Florida. He pays the sum of $200 a month for their

support. She further testified that her children when visiting her seemed to be happy and that she is sure they would rather be with her. In relation to this testimony Robert stated unequivocally that he would rather stay with his father. He testified that he loved his father and his mother but stated, as to Vance Price, "It's just that we don't hit it off * * *. It seems to me like he doesn't take too much of an interest in me."

The petitioner's present husband, Vance Price, testified that he thinks Robert and Renee are fine children, that he likes them very much and that he would treat them as he did his own children. He testified that he earns approximately $14,000.00 a year and that although he pays $200.00 a month support for his children by his former marriage, he feels that his financial condition would permit him to properly raise and educate these children. Mr. Price stated that he enjoyed good health, although he admitted that he had been under the care of doctors for a considerable period of time due to nervous tension. This condition was attributed by him to marital difficulties which he experienced during his former marriage which ended in divorce.

As herein noted, Robert Holstein, age 12 years, testified. In addition to relating that he would rather remain with his father, Robert said that his stepmother treated him and his sister as well as she did her own children; that she loved and cared for them; that he got along well with his stepbrothers and stepsisters; and that he enjoyed a good home and family life with his father and stepmother. The probative value of this witness's testimony was questioned by counsel for the plaintiff. It is well established that in controversies relating to custody of children, the child, if he is of the age of discretion, should be consulted, and due weight should be given to his desires. *Hurley* v. *Hurley,* 71 W. Va. 269, 76 S. E. 438; *Green* v. *Campbell,* 35 W. Va. 698, 14 S. E. 212, 29 Am. St. Rep. 843; *Rust* v. *Vanvacter,* 9 W. Va. 600. Robert was interrogated by the judge who determined that he was a good student and was qualified to testify. Of course, the child's testimony as to his desires is not controlling, but it is entitled to some weight and his desires should be considered.

Several other witnesses appeared on behalf of the defendant. We do not deem it necessary to relate the testimony of these witnesses but will note that such testimony supports the defendant's contention, as found by the court, that the children enjoy a good and happy home in the custody of their father.

As hereinbefore noted, the plaintiff asserts that the custody of her children should be restored to her. Her reason for this assertion is that there has been a change in the circumstances of the parties since the award of such custody to her former husband. It appears that she is attempting to show that her situation has improved since the court took the custody from her and that since that time the circumstances of the children has deteriorated.

While the plaintiff, Dolores Holstein Price, has expressed a desire to have custody of her children and has evidenced a feeling that she can give them a better home than they presently enjoy, the evidence wholly fails to support her allegations. At the time of the hearing the plaintiff had been married to Vance Price for eight or nine days. Admittedly, they did not have a home for the children which could be evaluated by the court. Robert Holstein testified that, though he loved his mother, he and Vance Price just "don't hit it off", and that he would rather live in Madison with his father. According to the testimony of Mr. Price, he and the plaintiff had dated for about six months before they were married. It is apparent that the children had little opportunity to become acquainted with him prior to their marriage. Furthermore, the evidence reveals that Vance Price had suffered a nervous disorder which required medication in the form of tranquilizers for a period in excess of three years and that the use thereof had been terminated some six months prior to his marriage to the plaintiff.

The plaintiff appears to rely heavily on the fact that she and her present husband are college graduates. She infers that by reason thereof the children will necessarily have a better home with them. Higher education is doubtless an asset and one who acquires a college degree is to be commended. However, that fact alone does not relieve this

plaintiff of the burden of proving that the circumstances, in relation to the welfare of the children, has so materially changed as to warrant a shift of custody back to her. We are firmly of the opinion that the plaintiff has failed to prove, as presently situated, that she can offer a home which would be more beneficial to the physical and moral welfare of these children.

Acknowledged by all who testified, and concurred in by the learned trial judge, is the fact that these children now enjoy a good and happy home life. They should not be taken from this home unless the proposed home would offer, not only material betterment, but moral inprovement and a better chance for a fuller life. In the circumstances of this case no showing has been made that the requested change of custody would result in such improvement. A change of custody at this time must necessarily be based on speculation.

Since the plaintiff and her husband had no home in which to bring the children on June 17, 1967, the time of the hearing, the court delayed the effect of his order until August 15, 1967. This ostensibly was for the purpose of allowing additional time to establish a home. What sort of home would these children have? What would be the relationship between these children and their stepfather? Upon the present state of the evidence, how can it be justly determined that these children will have a better future and a fuller life with the plaintiff? We believe that these determinations cannot be fairly made at this time.

The court has continuing jurisdiction over the matter of the custody of children. It should not, however, upon the hope that all will be well, change the custody unless there is valid evidence that such change is warranted. Stability and a feeling of permanence in his home life is essential to the well being of a child. He should not be passed from one parent to the other and back again unless such move is warranted by the evidence. There must be a showing in this case that Kenneth Holstein is no longer able or suited to retain custody or that the conditions or circumstances surrounding the children have so changed

that their welfare would be enhanced by awarding such custody to the plaintiff. Under the evidence in this case there was no such material change in the circumstances surrounding the children as to affect adversely their welfare; nor was there any such change in circumstances generally as would warrant a change of custody. Had some time passed prior to the institution of this proceeding, giving the plaintiff and her present husband sufficient time to establish a home as a base for a family unit, the award of custody made in this case may have been warranted. If a proper showing is made in the future, the court, under its continuing jurisdiction, could grant the custody of these children to the plaintiff. However, as noted, no such showing was made.

We are cognizant of the well established principle that the exercise of discretion by the trial court in awarding the custody of minor children will not be disturbed on appeal unless it clearly appears that such discretion has been abused. *Lucyk* v. *Brawner,* 144 W. Va. 690, 110 S. E. 2d 739; *Smith* v. *Smith,* 138 W. Va. 388, 76 S. E. 2d 253; *Pukas* v. *Pukas,* 129 W. Va. 765, 42 S. E. 2d 11; *Gates* v. *Gates,* 87 W. Va. 603, 105 S. E. 815. Necessarily implicit, however, in the foregoing principle is the tenet that the trial court's findings should be disturbed on appeal if it clearly is not supported by the evidence. This was succinctly expressed by our Court in *Pugh* v. *Pugh,* 133 W. Va. 501, 56 S. E. 2d 901, 15 A.L.R. 2d 424, in the following language: "To entitle the petitioner to the custody of the child it was incumbent upon her, in this proceeding, to show that a change of the existing custody of the child by the respondent would materially promote the welfare of the child. See *State ex rel. Lipscomb* v. *Joplin,* 131 W. Va. 302, 47 S. E. 2d 221. The evidence indicates clearly that she has failed to satisfy that requirement; and, under the evidence, the court should not have disturbed the existing custody of the child by the respondent."

While the facts of the *Pugh* case are not similar to those of the instant proceeding, it is implicit therein that this Court should take a meaningful look at the evidence and if the judgment is not supported by such evidence it should be

reversed. We have carefully considered the evidence in this case and are of the opinion that the plaintiff has failed to satisfy the requirements necessary to warrant the requested change of custody.

The judgment of the circuit court is therefore reversed and the proceeding is remanded with directions that it be dismissed.

*Reversed and remanded*
*with directions.*

CALHOUN, JUDGE, dissenting:

Respectfully I dissent. My dissent is based primarily on the fundamental principle stated in the third point of the syllabus of the majority opinion, quoting the eleventh point of the syllabus of *Smith* v. *Smith,* 138 W. Va. 388, 76 S. E. 2d 253, which is as follows: "The exercise of discretion by a trial court in awarding the custody of minor children will not be disturbed on appeal *unless it clearly appears that such discretion has been abused."* (Italics supplied.) To the same effect see *Witt* v. *Witt,* 141 W. Va. 43, pt. 4 syl., 87 S. E. 2d 524; *Walker* v. *Walker,* 109 W. Va. 662, 155 S. E. 903; *Norman* v. *Norman,* 88 W. Va. 640, pt. 6 syl., 107 S. E. 407. The rule applied in such cases is essentially the usual rule applied by this Court in reviewing findings of fact made by trial chancellors. Such findings of trial chancellors in divorce cases will not be reversed on appeal "unless such findings are clearly wrong or against the preponderance of the evidence, * * *." *Rohrbaugh* v. *Rohrbaugh,* 136 W. Va. 708, pt. 4 syl., 68 S. E. 2d 361; *Finnegan* v. *Finnegan,* 134 W. Va. 94, pts. 2 and 3 syl., 58 S. E. 2d 594.

Substantially the same principles are applied in a proceeding for change of a custody previously awarded. *Gates* v. *Gates,* 87 W. Va. 603, pt. 4 syl., 105 S. E. 815. In that case, in which the Court took custody from the father and awarded it to the mother, the Court made the following statement (87 W. Va. 607, 105 S. E. 816): "We are unable to perceive any departure in the decree from the sound discretion vested in the court below. * * * Besides, he had the parties before him and could avail himself of the aid afforded by their appearances, demeanor and conduct."

The general principles stated in the prior decisions of this Court previously referred to are summarized in 27B C.J.S., Divorce, Section 324(13), page 757, as follows: "The discretion of the lower court with respect to *awarding or changing* the custody and support of minor children is subject to review, but the determination of the court will not ordinarily be disturbed *unless there is a clear abuse of discretion or it is clearly against the weight of the evidence.*" (Italics supplied.)

This case does not involve merely an application for an initial award of custody. It involves restoration of a custody initially granted in a divorce action to the innocent spouse, the wife and mother, as against the guilty spouse whose cruel conduct initially caused the wreck of the matrimonial craft and the dispersal of the family so that there remained no possibility of their living together as a happy family under a single roof. That adjudication of the husband's guilt and that initial award of custody to the mother as the proper custodian of the minor children of the broken home was made in the divorce action, an adversary proceeding, with both parties to the marriage before the court, in person and by counsel, with full right to be heard. That custody was interrupted in an ex parte hearing held while the wife was outside the state. Whatever may have been the true and actual facts upon the basis of which the husband received custody during the wife's absence, the record clearly discloses that, upon her return, she was permitted to resume a divided custody of her children and that she promptly resumed a respectable place in the community as an active church member, a high school teacher and a devoted mother of her children.

As I shall undertake to point out subsequently in this opinion, the husband at the custody hearing involved in this case, produced no testimony to reflect in the slightest degree upon the character of the mother or her fitness to resume custody of her children, though the trial court, as will be stated more fully hereinafter, earnestly urged the husband's counsel to adduce any proof of that character which might be available to him.

"When a husband and wife are divorced because of the marital misconduct of one of them the law generally favors the award of custody of the children to the innocent spouse." *Rohrbaugh* v. *Rohrbaugh,* 136 W. Va. 708, pt. 5 syl., 68 S. E. 2d 361, and numerous decisions of this Court therein cited. To the same effect see 27B C.J.S., Divorce, Section 309 (6) b, page 468. In suing for divorce on the ground of cruelty in this case, the wife made the following allegation in her complaint: "Plaintiff says that the defendant has been guilty of extreme cruelty towards the plaintiff in and during their married life, that in and during their married life the defendant has called the plaintiff vile and vicious names such as god damn sons-of-bitches, whores, prostitutes, adulteress and has accused the plaintiff of having sexual intercourse with other men, and on different occasions the defendant has slapped and beat the plaintiff, and on one occasion cut the plaintiff with a hunting knife on the arm, and the defendant continuously nags the plaintiff, and has on many occasions threatened the plaintiff, and on February 25, 1964, the defendant struck and choked the plaintiff and kicked her in the stomach with his bare feet while she, the plaintiff, was in bed. The plaintiff says that by reason of the cruel treatment of the defendant towards the plaintiff, the plaintiff's health has been affected and she does not believe there can be a reconciliation of this marriage." It should be remembered that the two infant children were in the home meantime.

On March 7, 1964, the court entered a pendente lite order which, among other provisions, awarded temporary custody of the children to their mother, ordered the husband to pay $100 a month for their support and directed that "each of the parties hereto is enjoined from in any way molesting or interfering with the personal liberty of the other."

By an order entered on March 14, 1964, the court adjudged the husband to be in contempt of court "in direct violation of a former order enjoining him from in any way molesting or interfering with the personal liberty of the plaintiff;" and ordered that "the defendant be confined

in the Jail of this County for a period of Six Months unless sooner released by this Court."

The divorce order discloses that the parties appeared in person and by counsel, and that, after having heard the testimony of witnesses, the court adjudged: "That the defendant, Kenneth Ray Holstein, has been guilty of cruelty towards the plaintiff as alleged in the plaintiff's complaint." Pertinent considerations of this character are omitted from the majority opinion. By the same court order, the plaintiff was awarded custody of the two children, reserving to the father "reasonable right of visitation of the children born of this marriage at reasonable times and at reasonable places and in a law abiding manner." The order further provided: "The defendant is enjoined from harming the plaintiff or interfering with her personal liberty in any manner."

On August 5, 1964, in the ex parte proceeding, the mother not being present in person or by counsel, the court entered an order, a portion of which was quoted in the majority opinion, involving that which the second point of the syllabus refers to as "her own indiscretions." It is reasonably obvious that the trial court in the custody hearing now in question did not attach grave significance to these indiscretions, because the same order provided for visitation rights to the mother "at reasonable times and places and under reasonable circumstances."

For the guidance of trial courts in child custody cases, perhaps the most troublesome area of all trial judge responsibilities, this Court has stated another principle as follows: "Ordinarily, where the child will be equally well cared for by either parent, the mother, in preference to the father, if the child be of tender years, is entitled to its custody." *Beaumont* v. *Beaumont*, 106 W. Va. 622, syl., 146 S. E. 618. To the same effect, see *Settle* v. *Settle*, 117 W. Va. 476, 480, pt. 2 syl., 185 S. E. 859, 861; *Hughes* v. *Hughes*, 113 W. Va. 698, 700, 169 S. E. 403, 404; *Rierson* v. *Rierson*, 107 W. Va. 321, 323, 148 S. E. 203, 204. This general rule was stated by Judge Maxwell in *Reynolds* v. *Reynolds*, 109 W. Va. 513, 514, 155 S. E. 652, 653, as follows: "The

evidence adduced by the relator in no wise convinces us that this mother is unfit to be further intrusted with her God-given responsibility of looking after the welfare of her child. When a court exercises its great authority in taking from a mother her child of tender years, particularly a female child, such course is justifiable only where the most cogent reasons exist. And recognizing that in a normal mother, such as we believe this one to be, the deep-seated impulse to care properly for her young child is the controlling thought of her life, the mantle of charity should be thrown around her to the end that mistakes may be forgotten and the good may be emphasized. Since none are without fault, charity should prevail." At the time of the custody hearing, the son was twelve, and the daughter six years of age.

The majority opinion in the present case contains the following language: "The burden is on the petitioner to show that a change of the existing custody will be beneficial to the children. *Pugh* v. *Pugh,* 133 W. Va. 501, 56 S. E. 2d 901, * * *." As sole authority for that proposition, the *Pugh* case cited *State ex rel. Lipscomb* v. *Joplin,* 131 W. Va. 302, 47 S. E. 221, not a case involving a question concerning which of the parents should have custody of their child, but rather a case in which a mother sought to regain custody of her child from a respectable married couple to whom she had delivered the custody when the child was twenty days old. *Cunningham* v. *Barnes,* 37 W. Va. 746, 17 S. E. 308, is likewise cited in the majority opinion for the proposition that the burden was on the mother in this case to show that a change of custody would materially promote the moral and physical welfare of the children. That also was a case in which a parent was seeking custody of his child, the custody of whom he had surrendered "by fair agreement" to the child's grandparents after the death of the mother and when the child was about fifteen months of age. This Court, in a long line of cases of that character, has held that when a parent by fair agreement or otherwise voluntarily surrenders custody of his or her child to another person or to other persons, the parent will not be permitted to regain custody of the child except by showing

that such a change of custody will materially promote the moral and physical welfare of the child. Cases in this category are listed in *Whiteman* v. *Robinson,* 145 W. Va. 685, 691, 116 S. E. 2d 691, 695. To the same effect, see *Lucyk* v. *Brawner,* 144 W. Va. 690, pt. 2 syl., 110 S. E. 2d 739, and *Buseman* v. *Buseman,* 83 W. Va. 496, pt. 5 syl., 98 'S. E. 574. I suspect that the Court may have confused the principles relating to cases in this category with the quite different situation in this case which involves a contest between two parents claiming custody of children born to their marriage union.

The mother in this case has never by fair agreement or otherwise voluntarily surrendered custody of her children to anybody. In such circumstances, the welfare of the children was the polar star to guide the trial court in the exercise of the onerous burden of discretion imposed upon him by the law and the circumstances. *Suder* v. *Suder,* 112 W. Va. 664, syl., 166 S. E. 385; *Dawson* v. *Dawson,* 57 W. Va. 520, pt. 3 syl., 50 S. E. 613. This controlling consideration was recognized in the majority opinion, wherein the Court stated: "Both parties agree that the welfare of the children is the paramount and controlling factor in resolving this contest for the custody of their children."

I believe this record discloses that, by argument and innuendo, unfavorable reflections have been made in this Court upon the character of the mother and her present husband when, in the interest of candor and fairness, such matters, if they were intended to be relied upon seriously, should have been developed in the trial court.

Counsel for Kenneth R. Holstein inquired of several witnesses concerning Vance Price's previous use of "tranquilizers," of "his being nervous" and of his "nervous breakdown" at or about the time of his divorce from his former wife. During the course of the direct examination of Betty Woods, with whom Price had a courtship prior to his present marriage, the matter developed as follows:

"Q. You speak of his being nervous. Was he like that when you met him?

"The Court: Mr. Hendricks, I am not sure you mean to use that term. Do you mean a mental breakdown? That is what a nervous breakdown is. Do you have the testimony to prove that he had a nervous breakdown?

"Mr. Hendricks: In layman's language, I would say that anybody whose nerves had gone bad.

"The Court (interposing): That is not what a nervous breakdown is. You define your term a little better, unless you intend to prove something like that."

Despite this admonition by the court, there was no effort to prove that Price suffered a "nervous breakdown", any degree of mental disorder, alcoholism or anything whatsoever except that he took tranquilizers and "sleeping pills" under orders of doctors during the trying period when his own home was being broken up. Betty Woods testified that this occurred "after he was separated and he was waiting out a period so he could get a divorce on desertion. He was very nervous at that time."

Vance Price testified that he had "a yearly check once a year in Charleston and all the last four years I have been pronounced sound and fit." He testified further that, during the period of his nervous condition, he consulted the "company doctor" and that: "He advised me to go to the University of Virginia Hospital at Charlottesville and I went down there kind of hoping and thinking that the trouble was something other than nerves. That was his diagnosis. I saw several doctors while I was there. They gave me, I suppose, about every kind of examination they could and their findings were that it was due to nervous tension, that was my trouble at that time."

Price testified that he holds a master's degree from West Virginia School of Mines; that at the time he testified he was chief engineer for Amherst Coal Company and had held that position during the preceding four years; that he obtained a divorce on the ground of desertion; that his daughter at that time was fifteen and his son twelve years of age; that these two children were coming next day and "will be with me for three weeks vacation and visit with

me"; that "I dearly love my children and my children dearly love me"; and that if the custody of the two Holstein children were awarded to his wife, he would cooperate in any visitation rights granted to their father. He stated: "I think they should see their father. I think they should maintain contact with their father." He testified further: "I want what is best for Robert and Renee" and "our home will be built on love and understanding." In spite of the fact that the testimony wholly fails to reflect unfavorably upon the plaintiff's husband, the majority opinion states: "Furthermore, the evidence reveals that Vance Price had suffered a *nervous disorder* * * *." (Italics supplied.) The opinion, nevertheless, proceeds in the same sentence to state that the use of tranquilizers "had been terminated some six months prior to his marriage to the plaintiff."

In her petition for restoration to her of custody of the two children, the plaintiff alleged the change in circumstances since the custody was awarded to their father. The petition alleges that "the infant children of the parties hereto have strongly indicated their desire for a change of custody from their father to your petitioner." The petition states the facts concerning the former husband's remarriage and the fact children born of three separate marriage unions were living in the Holstein household. The plaintiff did not allege that Mr. and Mrs. Holstein were unfit persons to have the custody of the children.

In his answer to the petition for change of the custody of the children, the defendant did not allege that their mother was in any sense or for any reason an unfit person to have custody of the children. At the commencement of the custody hearing on June 17, 1967, counsel for the defendant asked for and received assurance from the court that the court order which awarded custody of the children to their father was a part of the record. Since the defendant, in his answer to the wife's petition for a return of custody to her, made no allegation that the mother was an unfit person to have such custody, there was no basis for a reasonable belief on the part of the plaintiff, her counsel or the court that the wife's moral character or fitness

was to become an issue in the case at any stage thereof. There was no pleading to suggest or support such an issue.

I do not find that the order which awarded custody to the father was referred to in any way throughout the remainder of the custody hearing. In any event, that order referred to a situation which was alleged to have existed about three years before the custody hearing was held. I do not find anywhere in the record even the slightest suggestion from the defendant that the plaintiff was an unfit person to have custody of the children at the time of the custody hearing or any basis for a belief on the part of the court, the plaintiff or her counsel that such a contention would be made at any subsequent time.

During the cross-examination of the defendant by counsel for the plaintiff, the following appears from the record:

"Q. Do you know of any conduct on her part since the change of custody to you that you think is in any way improper or immoral?

"A. Well, I don't approve of everything.

"Q. You haven't seen any conduct as such yourself?

"A. No, I haven't seen it.

"Mr. Hendricks: Do you want us to come with some information on this?

"The Court: * * * I think the moral character of all parties concerned is important. I thought you were going to get into that and exhausted your testimony on that point?

"Mr. Hendricks: No, we haven't.

"The Court: *If you have testimony to prove that Mrs. Price is an unfit mother because of her morals, I certainly would be interested* in it. (Italics supplied.)

"Mr. Hendricks: We would say this, *I believe we would like to stick to the facts the way it is now.* (Italics supplied.)

"The Court: Do you have anything to say on that point, Mr. Jarrell?

"Mr. Jarrell: We have her minister ˙and another minister. I have summonsed her husband's people, and also, friends who visited in her home and things to show that she is a good person of good moral character. They haven't brought that up so I don't need rebut it.

\* \* \*

"Mr. Hendricks: We rest. I have a motion.

"Mr. Jarrell: We rest unless the Court feels we should present the ministers."

It is obvious, I believe, from what has been stated heretofore in this opinion, that the plaintiff, her counsel and the trial judge were justified in assuming that counsel for the defendant had no intention to assail or question the moral character of the plaintiff existing at the time of the hearing. Hence, all of the plaintiff's character witnesses were excused. The trial court's ruling was not based on the character or reputation of the respective parents for the very good reason that such was not made an issue in the case, either by pleadings or proof.

Perhaps the trial court and plaintiff's counsel were misled and misinterpreted the purpose and intent of the defendant's counsel. Nevertheless, the court's order entered in August, 1964, in the ex parte proceeding, approximately three years before the custody hearing here in question, was referred to and emphasized both in the brief and oral argument of counsel in this Court. Innuendoes are thus belatedly urged long after the hearing at which the trial court virtually implored counsel for the defendant to come forward with any available proof to show that the mother was not at that time a proper and fit person to have the custody of the children.

The uncontradicted testimony is that the plaintiff, at the time of the hearing, was a person of good standing in her community; active in church work and regular in church and Sunday School attendance; a teacher in a nearby high school; that she loves her children and they love her; and that she has, whenever the children were with her, accompanied them to Sunday School and church services, and helped them with their school work. She

testified that their children repeatedly expressed their desire to be with her.

Robert was asked by counsel for the defendant: "* * * If you could just make this choice on your own, where you would rather stay and in what home, where would you like to go?" It is true that he indicated a preference for his father's home, but his testimony tends to indicate that this answer was mainly prompted by the fact that he disliked to move away from friends and go to a strange or different school. His mother testified that both children wanted to be with her but that Robert merely did not want to move to Man.

Though this dissenting opinion has already become perhaps unduly lengthy, I believe I could detail many more facts disclosed by the record which tend further to sustain the soundness of the trial court's judgment and exercise of discretion. In making his ruling at the conclusion of the custody hearing by which custody was awarded to the mother with reasonable right of visitation granted to the father, the trial judge stated:

> "I think this case points up how much turmoil and so forth you can come up with when you have a divorce, especially when families get all mixed up like this, but the problem of the Court right now is to try to decide what would be best for these two children involved. To begin with, I think the Court will commend Mr. Holstein for doing a good job and giving good care to the two children and from that point of view, I don't have any quarrel with Mr. Holstein at all. I think that all the evidence here is that his wife is a good woman and that they have a happy family life and are giving the children adequate care.
>
> "However, the Court feels like, looking at it in the long run, that the mother could, under these circumstances, give better care to the two of them, so I am going to change the custody to the mother and under certain conditions. [Here the trial court dealt with visitation right of the father and similar matters.]
>
> "* * * In the meantime, Mrs. Price will have the same rights of visitation that she has had * * *. Of course, if her circumstances were to change

materially in her marital situation, whether this case would be reversed or not, you can still petition the Court for a re-hearing—like it has been this time. I want to make this clear so the Court, on appeal, looking at this record, will have no questions of the reason I am ruling the way I am.

"The record, I think, already has shown that I find no fault with Mr. Holstein at all or his wife. The reason for this ruling is that, looking to the future, I feel that Mrs. Price, with the two children to think of, will give these two a better opportunity for a fuller life, for a better education and for a better preparation for life. It is on this basis that I am ruling the way I am."

This case is before the Court for exercise of its appellate jurisdiction. We have no jurisdiction or right to undertake here to try this case de novo. We have so often stated that we may be required to affirm a judgment based on a jury verdict even though we would have voted otherwise as members of the jury. So here, we are not at complete liberty to decide the case as we would if we had sat as the trial court. We are authorized merely to judge whether the findings of the trial chancellor are clearly wrong, or whether the trial court clearly abused the broad discretion with which he was clothed and burdened in determining the proper award of custody as between the two parents.

We have so often stated and reiterated the obvious common sense proposition that the trial judge who hears and observes the witnesses is in a far better position than an appellate court to make a sound judgment in factual matters based on testimony. Furthermore, the trial judge in this case has, in a very real sense, lived with this case for years.

I do not believe that the judgment of the trial court is clearly wrong, or that the trial judge improperly exercised his discretion in his award of custody of the minor children in this case. On the contrary, I believe his judgment is clearly right and that he reached a proper, wise and just decision in the exercise of his discretion in determining the proper custody of the two minor children.

For reasons stated, I would affirm the judgment of the Circuit Court of Boone County.